34938. ALTREE *et al. v.* HEAD.

Decided July 8, 1954—Rehearing denied July 30, 1954.

*Finley & Henson, Corbitt & Shaw,* for plaintiffs in error.
*Davis & Cullens,* contra.

QUILLIAN, J. 1. In reviewing this case it is first necessary to decide whether the trial court had jurisdiction to entertain the adoption proceedings. The act of 1941 (Ga. L. 1941, p. 300), as embodied in Code (Ann. Supp.) § 74-401, provides in part that "The superior courts of the several counties shall have exclusive jurisdiction in all matters of adoption. All petitions for adoption shall be filed in the county in which the adopting parent or parents reside," except for certain immaterial particulars not germane to this case. This court held in *Herring* v. *Graham,* 87 *Ga. App.* 291 (73 S. E. 2d 572), that a proceeding for adoption in which the child is not domiciled in this State is void. So, the jurisdiction of the Superior Court of Bartow County depended upon whether the child was legally domiciled in that county at the time the proceedings were begun. Code § 79-404 provides that the domicile of a minor child is that of his parents.

Code § 74-108 reads: "Until majority, the child shall remain under the control of the father, who is entitled to his services and the proceeds of his labor. This parental power shall be lost by: 1. Voluntary contract, releasing the right to a third per-

son. 2. Consenting to the adoption of the child by a third person. 3. Failure of the father to provide necessaries for his child, or his abandonment of his family. 4. Consent of father to the child's receiving the proceeds of his own labor, which consent shall be revocable at any time. 5. Consent to the marriage of the child, who thus assumes inconsistent responsibilities. 6. Cruel treatment of the child." As was held in *Shope* v. *Singleton,* 196 *Ga.* 506 (27 S. E. 2d 26), "Where a father relinquishes the custody and control of his minor child to another, the latter, if a suitable and proper person to have such custody and control, is legally entitled thereto." In *Durden* v. *Johnson,* 194 *Ga.* 689 (2) (22 S. E. 2d 514), it is held: "Where, after the death of the father, the mother becomes entitled to the custody and control of a child, such parental power and right may be lost by her just as in the case of the father . . . and a clear, definite, and certain voluntary contract releasing her right to the child to a third person becomes binding upon her, and is not subject to revocation without good cause shown." And, in *Manning* v. *Crawford,* 8 *Ga. App.* 835 (3) (70 S. E. 959), this court held: "The contract by which it is sought to establish that a parent has relinquished his parental rights must be clear, definite, and certain; but, though these essentials are required in order to create and constitute the contract of relinquishment, it is not required that the evidence as to the contract shall be undisputed. If the evidence by which it is sought to establish a contract to relinquish parental control is itself vague and indefinite, or shows that the minds of the contracting parties failed to meet—that there was a variance between the offer and the answer thereto— then a failure to prove the contract results. But a mere denial on the part of the defendant that the contract was made, or an assertion that the terms of the contract differed from those asserted by the plaintiff (even though supported by proof), raises merely an issue of fact as to whether the contract or gift sought to be asserted—if it be clear, definite, and certain in its terms— was or was not made."

It is patent, under the authorities above cited, that the domicile of Pearl Louise, the child involved in the instant case, was originally the domicile of her natural mother and father by adoption, Mrs. Renee and Arthur Altree; and if nothing had

happened to change that status, there would be no question that her legal domicile would now be in Middlesex County, England, and not in Bartow County, Georgia. On the other hand, if that status has changed by reason of the Altrees' relinquishing the right of custody and control of the child in any of the methods enumerated in Code § 74-108, the little girl's domicile was not from the time of such relinquishment or forfeiture in Middlesex County, but was in the county of the person who thereafter had legal custody of her. If the Altrees had by their conduct been divested of their right of custody to the child, and Mrs. Nannie Head became legally vested with the same, the domicile would be in the county of Mrs. Head's residence, Bartow County. The court was authorized to find from the testimony of the little girl herself that Arthur Altree forfeited all of his parental rights and every privilege incidental thereto, including the right of custody, under § 74-108 of the Code. While the Altrees disputed the child's testimony, it was for the trial judge to say whether he would believe the evidence supplied by this child that Arthur Altree had beaten her until she was black and blue, and had failed to furnish her with the necessaries of life. The court was further authorized to find that Mrs. Altree condoned and became a party to the mistreatment of Pearl Louise by her husband, by reason of the fact that, despite the mistreatment of the child by Altree, she continued to live with him and to keep the child under his dominion. The court was also authorized to find from the evidence of Mrs. Nannie Head—though her testimony was also denied by the Altrees—that she received a letter from Mrs. Altree, in substance as follows: that she did not love the child as she should on account of the circumstances of the birth of the child, and that her present husband was not good to the child and mistreated the child, and that she would be happy for either the petitioner or her son to have the child, and that she would send the child to them if they would pay for its passage from England to the United States.

Thus, after Arthur Altree had forfeited his parental rights to the child, it appears that Mrs. Altree made an offer to relinquish the custody of the child to Mrs. Head. This offer contained every necessary element of a contract for that purpose. It appears from the evidence of Mrs. Head that originally the child

was sent to Florida upon the agreement of Naith Head to adopt her, and that Naith Head's wife paid for the transportation of the child from England, and that later Naith was unwilling to go forward with his agreement, whereupon, before the offer contained in the letter referred to above was withdrawn, Mrs. Nannie Head, the applicant in this case, accepted that offer and furnished sufficient consideration for the same by repaying to Mrs. Naith Head the money that she had paid for the child's passage to America, and by taking the child into her home and generously giving the child all the necessities and some of the luxuries of life. The court was authorized to find also that Mrs. Head was a suitable person to rear the child. Thus, the domicile of Mrs. Head became the domicile of the child, and the Superior Court of Bartow County had jurisdiction of the proceedings.

2. The evidence, which we held in the foregoing division of this opinion sufficient to authorize the trial judge to find that the parental rights to the child had been lost by the Altrees' mistreatment of her and by Mrs. Altree's contract agreeing to relinquish her parental rights, was also sufficient to authorize the trial judge to determine that the child had been abandoned by the Altrees within the meaning of Code (Ann. Supp.) § 74-404, so that neither notice to her parents nor their consent to her adoption by Mrs. Head was necessary.

There was no abuse of discretion in entering the decree. The trial judge had for consideration and comparison the background and previous behavior of Mrs. Head and that of the Altrees, their apparent affection or lack of affection for the child, and their respective financial statuses. His decision, in view of the competent evidence in the case, was sound and just.

3. The plaintiff in error insists that the decree was invalid because predicated on hearsay evidence. While there was much evidence of no probative value introduced without objection— being objectionable as hearsay—there was much competent evidence in the record sufficient to sustain the decree. In these circumstances, nothing to the contrary appearing, the decree will be presumed to have been entered upon the legal evidence. What is written here is not to be construed as a holding that, under ordinary circumstances, consent to adoption and placing a child

in the temporary custody of the prospective foster parents is of itself abandonment.

*Judgment affirmed. Gardner, P. J., Townsend and Nichols, JJ., concur. Felton, C. J., and Carlisle, J., dissent.*

FELTON, C. J., dissenting. Code (Ann. Supp.) § 74-403 provides: "Except as otherwise specified in the following sections, no adoption shall be permitted except with the written consent of the living parents of a child." Code (Ann. Supp.) § 74-404 provides: "Consent of the parents shall not be required where a child has been abandoned by its parents, or where the parents of the child cannot be found, after a diligent search has been made, or where a parent is insane or otherwise incapacitated from giving such consent, and the court is of the opinion that the adoption is for the best interest of the child, or where the parents have surrendered all of their rights to said child to a licensed child-placing agency, or court of competent jurisdiction for adoption, or to the State Department of Public Welfare through its designated agents, or in the case of parents whose parental rights have been terminated by order of a juvenile or other court of competent jurisdiction, or where both parents are dead. Where a decree has been entered by a superior court ordering the father to support the child and the father has wantonly and wilfully failed to comply with the order for a period of 12 months or longer, consent of said father shall not be required and the consent of the mother alone shall suffice."

There is no evidence in the case to show that the mother of the child or her adoptive father consented in writing to an adoption by Mrs. Nannie Head. It therefore was necessary for Mrs. Head to prove that the child had been abandoned by both her mother and her adoptive father. I do not think that there was evidence authorizing the finding that the child had been abandoned by either. I do not think that the sending of the child to the United States to be adopted by the child's father and his wife or by Mrs. Nannie Head amounts to abandonment. That act and abandonment are so distinct and different, the motives and purposes actuating each so utterly inconsistent, that the question does not require detailed discussion. The fact that Code § 74-108 provides that parental control shall be lost by consenting to the adoption of the child by a third person does

not mean that it constitutes abandonment, and if it ever did mean such a thing, the provision for such a consequence was necessarily repealed by implication by the new adoption law, which requires the written consent of parents before an adoption can be declared or proof that the child has been abandoned by the parents. I think that the present adoption law makes the rights of the parents paramount, paramount even to the welfare of the child insofar as it is relevant in a case where the parents have not consented to an adoption or abandoned the child. Code § 74-108 also provides that parental power shall be lost by cruel treatment of the child. Even if that section means that cruel treatment may be sufficient to show abandonment, every case of cruel treatment cannot be held to constitute abandonment. I do not think that the trial judge considered the child's testimony in this case under the circumstances. The child was put on the stand and testified as follows: "That her name was Pearl Louise, and that her grandmother called her Patty or Pat. That she could not remember much about her life in England, but that Arthur, her stepfather, beat her until she was black and blue. That she was hungry most of the time and was cold all of the time when the weather was cold. That one night her mother put her in a taxicab, and that was the last she ever saw of her mother, that the taxicab took her to the airport, and the next thing she remembered was being in Florida. That she was not happy in Florida, but that she is very happy here with her grandmother and does not wish to go anywhere or stay with anyone except her Grandmother Head." When the child finished the above testimony, the judge stated that he did not wish to hear any further from the child, that he thought it best that the child should not be subjected to *any* examination in this matter. Such action by the judge precluded cross-examination of the child. But even if the child's testimony is considered, it does not show when she received the cruel treatment nor the circumstances surrounding it. The only other legal evidence of cruel treatment is the statement by Mrs. Head as to what the mother of the child wrote to her in letters which had been lost. Mrs. Nannie Head testified: "That the mother of the child had written to petitioner and told her that she did not love the child as she should on account of the circumstances of the birth of the child, and that

her present husband was not good to the child, and did mistreat the child and that she would be happy for either petitioner or her son to have the child, and that she would send the child to them if they would pay for its passage from England to the United States. . . That the child had been thin and pale when she first came to this country, and that the child always had a subdued look and that she always had an expression of fear as to physical harm upon her when she first came to the home of her son. That when the child first came to this country that she acted very much like a small puppy, and had a cowed expression on her face when spoken to and that she cringed and would run when spoken to. . . That she had received one or two letters from Renee Altree, the mother of the child, admitting that she did not love this child as a mother should, and admitting that her husband, Arthur Altree, had been mean and cruel to this child, and did not treat this child as he did his own children. . . That the child herself had related many acts of cruelty on the part of her stepfather, and as to beatings she received from her stepfather and of the fact that she never had enough to eat and was always cold when she lived with her mother and stepfather." The child was born on May 5, 1945, and came to the United States on November 13, 1949. There was no written consent by the parents to this adoption, and under our law there was no evidence that the child had been abandoned by her parents, so I think the court lacked the authority to allow the adoption by Mrs. Head.

If under ordinary circumstances consent to adoption and placing a child in the temporary custody of prospective foster parents are not of themselves abandonment, in the interest of parents it should be pointed out what circumstances in addition to the above may be considered sufficient. In this case I do not think that there are any additional circumstances which could be so considered. The unfortunate circumstances of the illegitimacy of the child I do not think can be so considered. The second husband of the mother of the child adopted it legally, and that act gave the child the same status as a legitimate; and, insofar as their abandoning the child by consenting to adoption and placing it with prospective foster parents is concerned, they occupy just as secure a position as natural parents. While we

are deciding law in a case which involves such distasteful facts as we have in this case, we should take care not to decide bad law which may have to be applied to natural parents. The same thing applies to the matter of cruel treatment. I think that it is extremely dangerous to set the precedent this case sets in permitting the finding of abandonment based on cruel treatment where the evidence of cruel treatment is so inconclusive and unsatisfactory. I doubt whether the same yardstick of cruel treatment would ever be applied to natural parents as has been allowed in this case. The decision of this court will bring heartache either way the decision might go, but the most important thing to my mind is that parents must be shown to have clearly and unmistakably abandoned a child before it can be adopted by another without their consent, and especially where the act or acts of abandonment are alleged to be cruel treatment.

CARLISLE, J., dissenting (on motion for rehearing.) Adoption is the establishment of the relation of parent and child between persons not so related by nature, and the process by which the adoption of a child is effected in this State is wholly statutory. The validity of an adoption in this State is, therefore, dependent upon the essential statutory requirements having been complied with. Two of the essential requirements of our statute are, among others, that the child sought to be adopted be domiciled in this State (*Herrin* v. *Graham*, 87 *Ga. App.* 291, 73 S. E. 2d 572), and that the written consent of the living parents of the child sought to be adopted be obtained. Code (Ann. Supp.) § 74-403.

Presumptively, the domicile of the child sought to be adopted in this case is in England in the home of its adoptive father, Mr. Altree, as by the law of this State "the domicile of every minor shall be that of his father, if alive, unless such father shall have voluntarily relinquished his parental authority to some other person; in such event the domicile of the minor shall be that of the person to whom parental authority has been relinquished." Code § 79-404. It nowhere appears in the record in this case that Mr. Altree, the adoptive father, ever voluntarily relinquished parental authority over the child to Mrs. Head, the paternal grandmother of the child sought to be adopted. This is true for the reason that the only evidence of such a relinquish-

ment of his parental control over the child is that Mrs. Head, the paternal grandmother, testified that he agreed for her to take the child and rear it as her own. Under the authority of *Waldrup* v. *Crane,* 203 *Ga.* 388 (46 S. E. 2d 919), and of *Broxton* v. *Fairfax,* 149 *Ga.* 122 (99 S. E. 292), such evidence is insufficient to establish a relinquishment of parental authority over the child. While it may be inferable—and I think it is—that Mr. Altree relinquished his parental authority over the child to Mr. Head, the putative father, and his wife, such that their domicile became the child's domicile for the purposes of their adopting the child, it is not inferable from the evidence in this case that Mr. Altree ever relinquished his parental authority over the child to Mrs. Head, the paternal grandmother, so as to make her domicile the domicile of the child; and, if that be true—and I think it is—the child was not domiciled in this State, and consequently under the authority of *Herrin* v. *Graham,* supra, the Superior Court of Bartow County was without authority to enter a decree effecting the adoption of the child by Mrs. Head.

Failing in her efforts to establish a voluntary relinquishment of *Mr. Altree's* parental authority over the child—as I think she did—the paternal grandmother also relies upon Mr. Altree's alleged abandonment of the child to effect the change of the child's domicile from his domicile to her domicile in Bartow County, Georgia. In this too I think she failed, as I shall demonstrate in my subsequent discussion of whether such alleged abandonment of the child by Mr. Altree obviated the necessity of his written consent for the paternal grandmother to adopt the child.

While it appears from the record in this case that Mr. Altree gave his written consent to the child's adoption by the child's putative father, Mr. Head, and his wife, it nowhere appears that the adoptive father, Mr. Altree, ever consented in writing to the child's adoption by Mrs. Head, the paternal grandmother. Failing to establish Mr. Altree's written consent to her adoption of the child, Mrs. Head, the paternal grandmother, relies upon Mr. Altree's alleged abandonment of the child, as by the terms of our statute an abandonment of a child by its parents obviates the necessity of obtaining the written consent of the parents.

The process of reasoning advanced by the majority to establish

the adoptive father's abandonment of the child, such that his consent became unnecessary and permitted the child's natural mother to contract away her parental authority to Mrs. Head, the paternal grandmother, so that the paternal grandmother's domicile became the domicile of the child for the purpose of the paternal grandmother adopting her is this: The adoptive father's cruel treatment of the child and his failure to keep her as well provided for as he did his own child of the blood constituted an abandonment of the child on his part. Upon his abandonment of the child, his parental authority reverted to the mother of the child, the wife of the adoptive father, and she, if she herself had not also abandoned the child, as suggested if not asserted by the majority opinion, by condoning and becoming a party to the adoptive father's mistreatment of the child, then contracted with the paternal grandmother to have the paternal grandmother adopt the child. It seems to me, if we assume the adoptive father's abandonment of the child—which I do not—that, if the father did abandon the child and by the same process the mother abandoned the child, neither had parental authority over the child so as to contract it away and thereby change the child's domicile.

"Under [adoption] statutes providing that abandonment may render such [statutory written consent] unnecessary, it is generally held that the abandonment must be such as to show a settled purpose to forego all parental duties and claims." *Glendinning* v. *McComas*, 188 *Ga.* 345 (3 S. E. 2d 562). I think no such settled purpose on the part of Mr. Altree is shown by the evidence in this case. Those facts which go to show an abandonment of the child, such as to obviate the necessity of obtaining the written consent of the parents to the adoption of their child, must be considerably stronger than those facts which might authorize a court of competent jurisdiction to order a change in a child's custody, such as to temporarily relieve the parents, or parent, of parental control. In the one case the abandonment of the child results in a complete severance of the relation of parent and child; in the other the abandonment results only in a temporary loss of parental control which a change in conditions may restore. See, in this connection, *Glendinning* v. *McComas*, supra, and the cases there cited, where my view is confirmed

that what are sufficient to constitute abandonment in criminal cases, in habeas corpus cases, in divorce cases, and in adoption cases are very different things.

To hold that a father's cruel treatment of a child and his failure to treat that child with the same love and affection as another child in his family will obviate the necessity of obtaining his consent to that child's adoption, would to my mind be productive of familial chaos.

I am further sustained in the view which I take of this case by the decision in *Jackson* v. *Anglin,* 193 *Ga.* 737 (19 S. E. 2d 914), where the Supreme Court held that, although the Juvenile Court of Fulton County had by proper order relieved the parents of their custody of the child, still their written consent to its adoption was necessary. By the terms of our statute itself (Code, Ann. Supp., § 74-404) it is evident that the parents must do something more than lose parental control of a child in order to obviate the necessity of their written consent to the adoption of the child, for, by the terms of the statute, even if the child is surrendered to a child-placing agency or a court of competent jurisdiction, such surrender must be made *for the purpose of having the child adopted.*

To recapitulate, I think that the father, Mr. Altree, did not abandon the child so far as the evidence in this case shows, and that Mrs. Altree did not abandon the child; that, if Mr. Altree did not abandon the child, its domicile never became that of the grandmother so as to confer jurisdiction upon the Superior Court of Bartow County; and that, if Mr. Altree never abandoned the child, Mrs. Altree was powerless to contract away the parental control which established the child's domicile in England. If Mr. Altree did not abandon the child, his consent to its adoption was an essential requirement to the adoption, and such consent is not established.

I can not concur in the majority opinion for the foregoing reasons. Felton, C. J., authorizes me to say that he concurs in what has been said herein.