S00A0118. STILLS et al. v. JOHNSON et al.
(533 SE2d 695)

Fletcher, Presiding Justice.

The issue presented by this petition for habeas corpus is the proper standard to be applied in a custody dispute between the paternal grandmother and the maternal uncle of the child, where neither relative is a parent as defined by Georgia law, and the child's parent has transferred "parental power" to the grandmother pursuant to OCGA § 19-7-1 (b) (1).[1] We hold that, in accordance with the development of the law in this state, where two parties seek custody of a child, and neither is a parent of the child, custody is to be governed by the standard of best interest of the child. Because the trial court applied the fitness standard in this case in awarding custody of the child to the paternal grandmother, we reverse and remand this case for application of the proper standard.

The child at the center of this custody dispute was born in February 1994 to Cassandra Stills and Steven Brian Trainer. Stills and Trainer did not marry. A year and a half after the child's birth, Trainer filed a petition to legitimate him which was unopposed by Cassandra, and the child's birth certificate was subsequently changed to name Trainer as his father. There are no disputes regarding paternity or legitimation.

Days before the child's birth Trainer was arrested in Georgia and charged with numerous felonies and misdemeanors. He was sentenced to two consecutive ten-year sentences and is currently incarcerated in Reidsville State Prison. Trainer has been incarcerated during the entire life of the child. For more than a year after the child's birth, Cassandra visited Trainer in prison, taking the child with her. These visits ceased at some point in 1996 when the relationship between Cassandra and Trainer became strained.

---

[1] OCGA § 19-7-1 (b) (1) provides, in pertinent part, "parental power shall be lost by: (1) voluntary contract releasing the right to a third person. . . ."

Trainer testified during the custody hearing in this case that he had not made any financial contributions to the support of the child during the child's lifetime and admitted that he had never telephoned or communicated with his son after Cassandra ceased bringing the child to the prison for visits. He conceded that he had not telephoned the child even after the court in this case granted him telephone visitation because he "didn't get a chance to call." Trainer additionally admitted that he had a lengthy criminal history, having been incarcerated in North Carolina for "a couple of weeks around 1983" and incarcerated in New Jersey following a burglary conviction in 1988.

Cassandra Stills died in August 1997, and the child went to live with Doris Stills, Cassandra's mother. When Doris Stills petitioned the Houston County probate court for temporary letters of guardianship of the child, Steven Trainer was served and objected. Trainer thereafter executed a document purporting to relinquish custody and his parental power over the child[2] to his mother, appellee Gertrude Johnson, a New Jersey resident. His petition states that the transfer of custody and parental power is "temporary" until such time as he is released from prison. Trainer additionally filed a petition for change of physical custody against Doris Stills which the trial court construed as a petition for habeas corpus pursuant to OCGA §§ 9-14-1 and 9-14-2. Doris Stills died of cancer during the pendency of these proceedings, and appellant Terry Stills, Cassandra's brother, was substituted as the party defendant. Terry Stills is married and is a resident of Texas. At the time of the custody hearing the child was living with Terry and his family.

Prior to his marriage, Terry shared an apartment with Cassandra in Atlanta for several years, including the time she was pregnant with the child at issue. Terry attended birthing classes with Cassandra and assisted in the labor room during the birth of the child. For approximately the first three years of the child's life Terry lived with him and was involved in caring for him. He paid the rent of the shared apartment during Cassandra's maternity leave, and sometimes paid for day care and necessities for the child. When the child was approximately three years old Cassandra moved from Atlanta to Columbus, Georgia to take another job. Thereafter Terry saw the child at least every other weekend, either in Columbus or at his mother's home in Warner Robins.

Appellee Gertrude Johnson offered evidence that she intermittently spoke to Cassandra by telephone and occasionally sent presents to the child prior to this custody dispute. She admitted that

___

[2] See OCGA § 19-7-1 (b) (1).

she had not met the child prior to the institution of these custody proceedings although she had been in the Atlanta area a number of times during the child's lifetime to visit another relative.

The dispute over the custody of this six-year-old child has been contentious. The record shows that after his mother's death, Terry Stills took the child to Texas without permission of the court. It is not disputed that Gertrude Johnson, during court-permitted visitation, took the child to New Jersey in direct violation of a court order and was subsequently held in contempt for her actions.

The trial court concluded that upon the death of Cassandra Stills, the right to custody of the child vested in Steven Trainer pursuant to OCGA § 19-9-2. That code section provides "[u]pon the death of either parent, the survivor is entitled to custody of the child; provided, however, that the court, upon petition, may exercise discretion as to the custody of the child, *looking solely to the child's best interest and welfare.*" (Emphasis supplied.)

The trial court further concluded that because Trainer had made a valid transfer of his parental power by voluntary contract to his mother pursuant to OCGA § 19-7-1 (b) (1), Gertrude Johnson had acquired a superior legal right to custody of the child, and that the burden shifted to Terry Stills to show that she was not a fit or proper person to obtain custody of the child. The trial court rejected Terry Stills's argument that the proper standard to be applied was the "best interest" of the child. Examining the evidence the court found that both parties were fit to be custodians of the child and that Terry Stills had failed to demonstrate by clear and convincing evidence that Johnson was not a fit custodian. The court thereafter awarded custody of the child to Gertrude Johnson.

This Court granted Terry Stills's application to appeal the grant of the petition for habeas corpus.[3]

1. Terry Stills argues that this case is controlled by the best interest of the child standard contained in OCGA § 19-7-1 (b.1). That code section provides:

Notwithstanding subsections (a) and (b) of this Code section or any other law to the contrary, in any action involving the custody of a child between the parents or either parent and a third party limited to grandparent, aunt, uncle, great aunt, great uncle, sibling or adoptive parent, parental power may be lost by the parent, parents, or any other person if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the cir-

---

[3] See Constitution of the State of Georgia of 1983, Art. VI, Sec. VI, Par. III (4); *Johnson v. Smith*, 251 Ga. 1 (302 SE2d 542) (1983).

cumstances of the case, determines that an award of custody to such third party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child or children, but this presumption may be overcome by a showing that an award of custody to such third party is in the best interest of the child or children. The sole issue for determination in any such case shall be what is in the best interest of the child or children.

It can readily be seen that the General Assembly intended for this code section to apply only to custody disputes between "the parents or either parent" of the child and a specified group of relatives. Resolution of such custody disputes is to be governed by the best interest of the child. Neither party in this case is a "parent" as defined by Georgia law.[4] By its express terms OCGA § 19-7-1 (b.1) does not apply in a custody dispute between a grandmother and an uncle, and therefore its provisions do not govern the outcome of this case. We therefore decline to address the parties' and the dissent's arguments regarding the constitutionality of OCGA § 19-7-1 (b.1). The constitutionality of that code section was not raised by the parties below and is not present in this appeal. This opinion should not be read as intimating any direction with regard to that issue.

2. In reaching its decision the trial court relied on two cases, *Shope v. Singleton*[5] and *Durden v. Johnson*.[6]

In *Shope v. Singleton* the child's father gave "custody and control" of the child to a grandmother. Thereafter the father died. With the grandmother's permission, the child went to live with neighbors. The grandmother subsequently filed a petition for habeas corpus against the neighbors, seeking return of the child. This Court concluded that the grandmother had a superior legal right to the child by virtue of the father's voluntary agreement, and absent a showing of the grandmother's unfitness, the grandmother was entitled to custody of the child. *Shope* is but one of many in a line of cases in which the courts applied a fitness standard to resolve a custody dispute between non-parents, one of whom had been given the child by a parent.

---

[4] OCGA § 19-8-1 (8) provides that " 'parent' means either the legal father or the legal mother of the child." OCGA § 19-11-3 (7) defines "parent" as "the natural or adoptive parents of a child." See also *Sutter v. Turner*, 172 Ga. App. 777, 782 (325 SE2d 384) (1984).

[5] 196 Ga. 506 (27 SE2d 26) (1943).

[6] 194 Ga. 689 (22 SE2d 514) (1942).

The issue before us is whether, under the rule set out in *Shope*, a biological parent's voluntary release of parental power to his mother gave her a "superior legal right" to custody which cannot be overcome absent a showing of her unfitness. In resolving this question we point out that this case does not involve an intact family; it does not involve a parent with physical custody; and it does not even involve a parent who has provided financial or emotional support for his child.

Nor is either party to this action a parent or legal custodian of the child. As we have previously noted, the grandmother is not a "parent" of the child within the meaning of OCGA §§ 19-8-1 or 19-11-3 (7). She is not a "legal custodian" of the child pursuant to OCGA §§ 19-9-22 (2) or 15-11-43.[7] These code sections provide that a legal custodian is one who has been given legal custody by court order. In *Alvarez v. Sills*,[8] this Court held that under the strict terms of OCGA § 19-9-22 (2), legal custody of a child cannot be conferred by agreement, but may only be conferred by court order. Under the law which has developed since the rule set out in *Shope*, an agreement transferring parental power pursuant to OCGA § 19-7-1 (b) (1) may be considered as a factor by the court in a custody proceeding.[9] However, unless incorporated into a court order, that agreement does not convey legal custody.[10]

The voluntary agreement in this case was not an award of legal custody by a court order. It did not, as a matter of law, make Gertrude Johnson a "parent" of the child or vest in her a superior legal right to custody. Taking into consideration the development of the law since the rule in *Shope*, we hold that where neither party seeking custody is a parent as defined by Georgia law, a determination of custody is to be made according to the best interest of the child[11] even where there exists an agreement by which a parent of the child has transferred parental power to one of the parties seeking custody. The parent's wish as expressed by the transfer of parental power is, of course, an important factor to which the court shall give substantial weight in determining the best interest of the child.

The rule discussed in *Shope* deprives a child whose parent has voluntarily transferred parental power to a third party of having his or her best interest dictate the outcome of a subsequent custody dispute with another non-parent. That rule evolved during an era when

---

[7] With regard to OCGA § 15-11-43, see *O'Neal v. Wilkes*, 263 Ga. 850 (3) (439 SE2d 490) (1994).

[8] 258 Ga. 18 (365 SE2d 107) (1988).

[9] Id. at 19, n. 1.

[10] Id.

[11] See generally *Connor v. Rainwater*, 200 Ga. 866, 870 (38 SE2d 805) (1946), which recognizes that where the custody dispute is between non-parents, the "child's interest and welfare" should prevail even when one party has a "legal right" by virtue of an agreement.

a child had no separate legal status and was considered to be virtually a property interest of the parents. A parent with sole custodial rights was free to make a "gift" of the child to a third party with little deference given to whether this transfer was in the best interests of the child.[12] In any subsequent custody dispute between the recipient of the "gift" of the child and a third party, the focus was on the fitness of the recipient of the "gift" rather than on the child. The rationale underlying this rule is inconsistent with contemporary recognition of children as individuals whose best interests, welfare and happiness are entitled to protection.

Further use of the fitness rule in a case where the parent has exercised poor judgment in selection of the party to whom parental power is transferred places the child at the mercy of a stringent requirement that the recipient of that power be shown to be "unfit" before custody can be changed. Application of the best interest standard allows the court making a custody determination to consider a multitude of factors, including the fitness of the potential custodian, which afford more protection for the child.

As between parents seeking custody, the best interest standard is applied.[13] In a custody dispute between two non-parents, the standard must also be the best interest of the child. Otherwise the law would protect a child more in a custody dispute involving his or her own parent than in one involving non-parents. To the extent that *Shope v. Singleton*, its progeny and its predecessors suggest that different standards should apply, they are overruled.

*Durden v. Johnson*,[14] also relied on by the trial court, involved a custody battle between a parent and the aunt to whom that parent had transferred parental power. It is inapplicable to the custody dispute between these parties who are neither parents nor legal custodians of the child.

The purpose of the standard we now adopt is to ensure that children are treated fairly as individuals and that a determination of custody as between non-parents will focus on their best interests, welfare and happiness. Contrary to the dissent's position, this standard does not impinge on the interests of parents in matters involving the custody and control of their children. Nor does it undermine the choice of a custodial parent who relinquishes parental power to a third person. In any subsequent custody dispute the parent's choice

---

[12] See *Rawdin v. Conner*, 210 Ga. 508 (81 SE2d 461) (1954); *Waldrup v. Crane*, 203 Ga. 388 (46 SE2d 919) (1948); *Bailey v. Holmes*, 163 Ga. 272 (136 SE 60) (1926); *Altree v. Head*, 90 Ga. App. 601 (83 SE2d 683) (1954).

[13] OCGA § 19-9-3; *Dyche v. Dyche*, 218 Ga. 833 (131 SE2d 104) (1963); *Dorminy v. Dorminy*, 242 Ga. 326 (249 SE2d 49) (1978).

[14] 194 Ga. 689 (22 SE2d 514) (1942).

will be given substantial weight by the courts in determining the best interest of the child.

The dissent would adopt a standard that a "parent's selection of a custodian or guardian must control unless the child would be harmed by doing so."[15] However, such a standard has never been applied to custody disputes. It has only been used to determine the constitutionality of the Georgia Grandparent Visitation Statute,[16] which is not at issue in this case.

3. We note that there remains pending a petition filed by Terry Stills in the juvenile court to terminate the parental rights of Steven Trainer. Should the juvenile court conclude that in accordance with the standards set forth in OCGA § 15-11-81 there is clear and convincing evidence of Steven Trainer's inability or failure to render proper parental care to the child, and that it would be in the best interest of the child to terminate Steven Trainer's parental rights, then Trainer's attempt to relinquish his parental power to his mother by voluntary contract would be of no effect.[17] On remand, the trial court should first resolve the termination proceeding before finally adjudicating the custody issue.

Pursuant to OCGA § 15-11-81 (b) (4) (B) (iii), a court is authorized to consider in termination proceedings the "[c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship." While a parent's incarceration does not always compel the termination of parental rights, it can support a termination where there are sufficient aggravating circumstances present.[18] These aggravating circumstances may include a history of incarcerations for repeated criminal offenses and a determination that it is likely such criminal history will continue upon release.[19] Other factors which may be considered by the court in aggravation include whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a "meaningful, supportive and parental manner."[20] An incarcerated

---

[15] Dissent, p. 653.

[16] *Brooks v. Parkerson*, 265 Ga. 189, 194 (454 SE2d 769) (1995).

[17] See *Benjamin v. Bush*, 208 Ga. 453 (67 SE2d 476) (1951), which held that abandonment of a child by his parent prior to making a contract voluntarily relinquishing parental power over the child renders the contract of no effect. In *Bush* the mother abandoned the child by leaving it in the woods after birth. The extreme facts of that case do not, however, preclude a determination that parental rights may be lost in other ways prior to the execution of a voluntary contract purporting to relinquish those parental rights to another. OCGA §§ 19-7-1 (b); 15-11-81.

[18] *In the Interest of D. A. P.*, 234 Ga. App. 257, 259 (506 SE2d 438) (1998).

[19] Id.; *In the Interest of L. F.*, 203 Ga. App. 522 (417 SE2d 344) (1992); see also *In the Interest of B. M. L.*, 239 Ga. App. 511, 512 (521 SE2d 448) (1999).

[20] *In the Interest of D. A. P.*, 234 Ga. App. at 259; OCGA § 15-11-81 (b) (4) (C) (i).

parent's claim that parole is a future possibility at which time he or she will be able to care for the child is "based entirely on conjecture."[21]

For the foregoing reasons, the judgment in this case is reversed and the case is remanded for proceedings consistent with this decision.

*Judgment reversed and case remanded. All the Justices concur, except Sears, Carley and Hines, JJ., who dissent.*

SEARS, Justice, dissenting.

Today, the majority holds that a parent's selection of a person to care for his child when he is no longer able to do so is subject to attack by a third party based upon a best-interest-of-the-child standard. Because this holding threatens to do serious damage to the fundamental relationship between a parent and his child, conflicts with recent precedent of this Court, and has far-reaching and potentially devastating implications for the families of this State, I must dissent.

1. "Bad facts make bad law," and this case has bad facts: The father of the child has been incarcerated for the child's entire life for committing numerous felonies and misdemeanors; the child's mother has died; the child's maternal grandmother has died; and the child's relatives have engaged in contentious litigation regarding custody of the child. The ramifications of the majority's decision, however, will reach far beyond the "bad facts" of this particular case. Although this case involves an imprisoned father who has had little contact and virtually no relationship with his son, the majority's decision will equally affect any father who has devoted many years of effort to support and rear his child. Similarly, although the father in this case transferred his parental power because of his imprisonment, the majority opinion will equally affect a father who is suffering from a chronic or fatal disease and is forced by those circumstances to choose someone else to care for his child while he is still alive. It will also equally affect and open to second-guessing every decision made by a father designating a guardian in a will to care for his child after his death. Thus, in a case involving bad facts and a parent who might eventually lose his parental rights (but who has not yet been deemed unfit),[22] the majority today issues an opinion that will significantly and detrimentally impinge on one of a parent's most sacred decisions — who will take care of his child when the parent can no longer do so.

2. The majority concludes that a third party's challenge to a parent's selection of a guardian or custodian for his child must be determined based upon the best interest of the child, only giving the par-

---

[21] 234 Ga. App. at 260.
[22] See Division 3 of the majority opinion.

ent's selection of a guardian consideration within the confines of that determination.[23] I would follow recent precedent of this Court to conclude that the parent's selection of a custodian or guardian must control unless the child would be harmed by doing so.

The United States Supreme Court has recently reiterated that the liberty "interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme Court]."[24] At issue in *Troxel v. Granville* was a State of Washington statute that permitted any person to petition a " 'court for visitation rights at any time' " and that permitted the court to grant such visitation as " 'may serve the best interest of the child.' "[25] The statute accorded no presumption of validity and gave no weight to the parents' decision regarding whether visitation was in the child's best interests. The Supreme Court described the statute as "breathtakingly broad,"[26] and concluded that it was significant that the grandparents seeking visitation in that case did not allege that the parent was unfit, as "there is a presumption that fit parents act in the best interests of children."[27] Because of the breadth of the Washington statute and because the superior court in the State of Washington did not give any "material weight" to the parent's visitation decision in awarding grandparent visitation, the Supreme Court held that the Washington statute, as applied, unconstitutionally infringed on the parent's "fundamental right to make decisions concerning the care, custody, and control of her two daughters."[28] Because of the foregoing holding, the U. S. Supreme Court held that it was unnecessary for it to decide "whether the Due Process Clause required all nonparental visitation statutes to include a showing of harm or potential harm to the child as a condition precedent to granting visitation."[29]

Although the Supreme Court in *Troxel* concluded that it was not necessary for it to decide whether due process required a showing of harm to a child before a nonparent visitation statute could be constitutional, this Court has held that such a requirement is necessary. In *Brooks v. Parkerson*,[30] this Court reviewed our own grandparent visitation statute. We concluded that under our state "constitutional pro-

---

[23] Majority opinion at 651.

[24] *Troxel v. Granville*, 2000 WL 712807, 5 (Case No. 99-138, decided June 5, 2000).

[25] *Troxel*, 2000 WL at 6, quoting Section 26.10.160 (3) of the Revised Code of Washington.

[26] *Troxel* at 6.

[27] Id. at 7.

[28] Id. at 9.

[29] Id.

[30] 265 Ga. 189 (454 SE2d 769) (1995).

tections of liberty and privacy,"[31] " '[t]he right to the custody and control of one's child is a fiercely guarded right in our society and in our law. It is a right that should be infringed upon only under the most compelling circumstances.' "[32] We concluded that our grandparent visitation statute was unconstitutional because "even assuming grandparent visitation promotes the health and welfare of the child, the state may only impose that visitation over the parents' objections on a showing that failing to do so would be harmful to the child."[33]

Although the present case involves a parent's decision regarding who will care for his child when he is no longer able to do so, and not the right of a third person to visit with a child in a parent's custody, as in *Troxel* and *Brooks*, the same fundamental concerns are implicated by this case. There are few more monumental decisions for a parent regarding the care of his child than the selection of who will care for his child when he is no longer able to do so. Moreover, generally, there is no person, including any trial or appellate judge, who is better able to evaluate the persons best suited to be a guardian for a child than the child's parents. As has been so eloquently stated:

> No person is in a position to know as well who should have the custody of children as the surviving parent. . . . He has observed them throughout their lives. By daily contact he knows their temperaments and habits, and by observation he knows those who have evidenced the greatest interest in his children, and those whose moral and spiritual values are in his judgment conducive to the best interests of his children. A judge treads on sacred ground when he overrides the directions of the deceased with reference to the custody of his children.[34]

For these reasons, I believe the majority commits grievous error by permitting a parent's selection of a guardian to be overridden based upon a best-interest-of-the-child standard. I would adopt the same standard we did in *Brooks*, and require that a parent's right to decide who should care for his child when he cannot do so should not be infringed except when harm to the child will result from honoring the parent's selection. In this regard, I would hold that if the person designated by the parent is unfit, then the parent's choice would harm the child and the parent's decision would not be entitled to any deference. Moreover, the rule I propose is not "inconsistent with contem-

---

[31] *Brooks*, 265 Ga. at 192.
[32] *Brooks*, 265 Ga. at 192 (quoting *In re Suggs*, 249 Ga. 365, 367 (291 SE2d 233) (1982)).
[33] Id. at 194. Accord *Fowler v. Knebel*, 266 Ga. 317 (467 SE2d 177) (1996).
[34] *Comerford v. Cherry*, 100 S2d 385, 390 (Fla. 1958).

porary recognition of children as individuals whose best interests, welfare and happiness are entitled to protection."[35] Rather, my position simply recognizes a child's profound and unique relationship with his family; that a parent and not a third party, a court, or a government is in the best position to judge a child's best interests; and that a parent has a fundamental right to direct and control the care of his child.

The majority also states that my reliance on *Brooks* is misplaced because the standard established in *Brooks* has never been applied to a custody dispute, but was only applied in determining the constitutionality of our Grandparent Visitation Statute.[36] Visitation rights, however, have always been considered a part of custody in this State.[37] In fact, the majority overlooks the fact that it relies on the Georgia Child Custody Intrastate Jurisdiction Act of 1978 ("the Act"),[38] and that that Act defines custody to include visitation. Accordingly, my reliance on *Brooks* in the present case is appropriate.

3. Furthermore, relying essentially on *Alvarez v. Sills*[39] and the definition of "legal custody" contained in the Act, the majority concludes that recent developments in the law justify determining the present custody dispute using the best-interest-of-the-child standard. *Alvarez* and the Act, however, are simply inapposite to the present case.

In *Alvarez*, the mother of twin daughters transferred custody of the daughters to her aunt by way of a voluntary agreement. The mother later brought a petition for habeas corpus, contending that under the terms of the agreement, the aunt had to transfer custody of the girls back to the mother. The aunt contended, on the other hand, that she had "legal custody" as defined under the Act,[40] and that because the Act prohibited actions in the nature of habeas corpus seeking a change of custody, the mother's petition for habeas corpus was barred. In this regard, the Act defined "legal custody" as custody awarded "by a court order." This Court held that the aunt had custody under an agreement, that she did not have "legal custody" as defined under the Act, and that therefore the prohibition against habeas petitions contained in the Act did not apply.

The majority errs in relying on *Alvarez* and the definition of "legal custody" contained in the Act. First, the purpose of the Act is to

---

[35] Majority opinion at 650.
[36] Majority opinion at 651.
[37] *Wrightson v. Wrightson*, 266 Ga. 493, 496 (467 SE2d 578) (1996); *Prater v. Wheeler*, 253 Ga. 649 (322 SE2d 892) (1984).
[38] See OCGA §§ 19-9-21 to 19-9-24.
[39] 258 Ga. 18 (365 SE2d 107) (1988).
[40] See OCGA §§ 19-9-23 (a), (b); 19-9-22 (2).

"[a]void jurisdictional competition and conflict by courts within this state in matters of child custody";[41] to "[a]void relitigation of custody decisions of other courts in this state insofar as is feasible";[42] and to "[f]acilitate the enforcement of custody decrees."[43] Thus, the Act was never intended to address anything other than court-ordered custody, and the Act's definitions are irrelevant in determining principles that should apply in resolving disputes when a parent has chosen another person to care for his child.

Moreover, *Alvarez* involved a dispute between a parent and the person to whom the parent had transferred custody by agreement, and, for this reason, *Alvarez* did not set forth any principles that apply when a parent selects a guardian for his child and another person attempts to overturn the parent's selection. Most importantly, contrary to the implications in the majority opinion, *Alvarez* did not hold that a person selected by a parent to have custody of the parent's children does not have a legal right to custody. If the aunt in *Alvarez* did not have a legal right to custody as a result of the agreement, this Court would not have directed that on remand the aunt could seek to prove that she had a right to custody under the terms of the agreement with the mother.[44] Although the aunt in *Alvarez* did not have a superior right to custody in relation to the mother of the children, she did have rights that arose by virtue of the agreement, and, if the agreement were interpreted in her favor on remand, she had the right to custody of the children.

Ironically, then, *Alvarez* actually supports the proposition that the paternal grandmother in the present case has a superior right to custody compared to the child's uncle. As did the aunt in *Alvarez*, the paternal grandmother in this case should be considered to have a right to custody by virtue of the agreement with the child's father. On the other hand, the child's uncle has no concomitant right to custody.

Moreover, to the extent that the "recent developments" on which the majority relies require a custody dispute between a third party who has been chosen by a parent as a guardian and a third party who challenges that selection to be resolved by looking to the best interest of the child, those recent developments are unconstitutional under our holdings in *Brooks*[45] and *Fowler*.[46] The public policy of this State is created by our Constitution, our statutes, and our judicial decisions.[47] *Brooks* and *Fowler* established the meaning of our constitu-

---

[41] OCGA § 19-9-21 (a) (1).
[42] OCGA § 19-9-21 (a) (6).
[43] OCGA § 19-9-21 (a) (7).
[44] *Alvarez*, 258 Ga. at 19, n. 1.
[45] *Brooks*, 265 Ga. at 194.
[46] *Fowler*, 266 Ga. at 317.
[47] *Porubiansky v. Emory Univ.*, 156 Ga. App. 602, 604 (275 SE2d 163) (1980).

tion with regard to a parent's right to control the care and custody of his children. The "recent developments," as interpreted by the majority, contravene that public policy and therefore should not be relied upon to support the majority's holding in this case.

Furthermore, the majority reasons that because custody disputes between parents are resolved based upon the best interest of the child, that same standard must be applied to the present case.[48] "Otherwise the law would protect a child more in a custody dispute involving his or her own parent than in one involving non-parents."[49] In labeling this case as one involving "non-parents," the majority conveniently, erroneously, and unconstitutionally excises the parent from the custody equation. When, as here, a parent chooses a third party to care for his child and another third party challenges the parent's decision, the third party chosen by the parent stands on superior footing to the other third party, as the parent has a fundamental right to direct who should care for his child if he cannot do so. Therefore, when a parent selects a third party to care for his child and another third party challenges that selection, the dispute is not between two third parties, but between the parent and the third party who challenges the parent's selection. The third party challenging the parent's decision does not stand on the same footing as the parent and should not be able to defeat the parent's decision based upon a best-interest-of-the-child standard. Thus, it is entirely reasonable to resolve such custody disputes by permitting the third party challenging the parent's selection to prevail only if he can show that the parent's selection will harm the child. On the other hand, in custody disputes between parents, it is appropriate to apply the best-interest-of-the-child standard, as the parents stand on equal footing concerning their interests in the child.

Finally, to support its holding that "a determination of custody is to be made according to the best interest of the child even where there exists an agreement by which a parent of the child has transferred parental power to one of the parties seeking custody,"[50] the majority relies on *Connor v. Rainwater*.[51] In *Connor*, however, this Court specifically did not address the issue mentioned in the majority opinion:

> In view of the imperfectly established right of the mother to contract with a third person for custody and adoption of the child, it is not necessary in this case to pass on the question

---

[48] Majority opinion at 650.
[49] Id.
[50] Majority opinion at 649.
[51] 200 Ga. 866 (38 SE2d 805) (1946).

of whether or not a third person, having a valid contract with the parent or parents exercising all of the parental power under the law, can, in the absence of proof of her unfitness to rear the child, be denied an award of custody of the child on a habeas corpus action.[52]

4. Although I recognize that the majority opinion is benevolent in intent, I conclude that the majority's holding is flawed and will only ultimately lead to rifts in families by pitting one relative against another in custody battles over children who have lost their parents and are in desperate need of stability in their lives. Moreover, as I have demonstrated, the majority fails to give proper deference to a fit parent's right to select the person who will care for his child if he is unable to do so. Because I believe that this decision will have negative repercussions for the parents and children and families of this State, I respectfully dissent.

I am authorized to state that Justice Carley joins in this dissent.

HINES, Justice, dissenting.

Although I do not agree with all that is said by Justice Sears, I join in the decision to dissent because I strongly believe that a fit parent's selection of a guardian or custodian for the parent's child must control absent the determination that the selected third party is unfit. Unfortunately in this case, the issue of the parent's fitness was questioned and remained unresolved by a court of law prior to the award of third-party custody.

DECIDED JULY 10, 2000 —
RECONSIDERATION DENIED JULY 28, 2000.

*Husser, Gammage & Frazier, Genevieve L. Frazier*, for appellants.

*Bernadette C. Crucilla, Robert E. Turner*, for appellees.

*Kutner & Bloom, Jeanney M. Kutner, H. William Sams, Jr.*, amici curiae.

---

[52] Id. at 871.