520 S.E.2d 470 (1999)
238 Ga. App. 304
In the Interest of I.S. et al., children.
No. A99A0489.
Court of Appeals of Georgia.
May 27, 1999.
*471 Darden & Moyers, Richard M. Darden, John D. Gatch, Savannah, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Edith J. Gilbert, for appellee.
SMITH, Judge.
The mother of I.S. and G.S. appeals from the order of the Juvenile Court of Chatham County terminating her parental rights, alleging that the evidence was insufficient to support the termination. We find no error, and we affirm.
The record shows that I.S. and G.S., then aged four years old and ten months old, respectively, were placed in the custody of the Chatham County Department of Family & Children Services in September 1993, after DFACS received a report concerning injuries to G.S. G.S. was admitted to a local hospital because of severe burns to his feet, described as "stocking" or immersion burns. Following an investigation, the juvenile court entered an order finding G.S. and I.S. to be deprived. According to the order, the mother stated that she had left the two children in the bathtub for no more than two minutes, that she heard G.S. cry and returned to the bathroom to find G.S. "standing in the empty bath tub with skin hanging off his feet." The juvenile court found more credible the testimony of medical personnel stating that G.S.'s burns were caused by immersion in hot water and that the burns "were consistent with the child having been held and his feet dipped deliberately into scalding hot water." According to one caseworker, G.S. was required to undergo hydrotherapy, and he also was hospitalized because of a virus "attributed to eating bad food at the residence." G.S. was temporarily placed with his maternal aunt and I.S. with his maternal grandmother, but the children were later placed into foster care and, at the time of the termination hearing in July 1998, had lived in several different foster homes. The mother pled guilty to the felony charge of cruelty to children arising out of the incident with G.S. and received a ten-year suspended sentence.
After DFACS took custody of the children, a reunification plan was developed for the mother requiring her to attend parenting classes, undergo a psychological evaluation, visit with the children regularly, and cooperate *472 with DFACS. A supplemental order also required her to engage in counseling for the purpose of reducing "the risk of a recurrence of physical abuse." The caseworker who developed the mother's initial plan and worked with her for the first 30 days testified that she was hostile, defiant, and verbally abusive on several occasions and that she offered "no cooperation whatsoever." He described her as "one of the most oppositional people that I've ever had to work with." According to the caseworker who worked with the mother for the remainder of the proceedings, the mother was often hostile and uncooperative.
Evidence was presented that the mother completed parenting classes as required by the plan. The mother's caseworker also testified that the mother visited with the children on a "fairly regular" basis and that family interaction went well, although the mother often was late despite her caseworker's efforts to find a convenient time for the mother to visit. Even on her last visit with the children, the mother arrived late and left early. The caseworker also testified that the mother often seemed to give other activities, such as college, higher priority than the children.
Despite the caseworker's testimony that the mother's interactions with the children were usually positive, I.S.'s foster mother testified that his response to visits with the mother was "[t]errible. When he comes back home, it takes us a few days to stabilize him again. He's disruptive [and] oppositional." The foster mother also testified that I.S. refused to discuss visits with his mother and that he was belligerent both before and after the visits. A family service worker who took I.S. to see the mother testified that he often did not want to visit.
With respect to the requirement that the mother obtain counseling, evidence was presented that from 1995 through 1997 she saw four different therapists. She first met with Dr. Bernard McGahee, beginning in February 1995, for a total of six out of ten scheduled sessions. He testified that she made no progress, that she denied "any responsibility" for the injuries to G.S., and that she "just quit showing up" for her sessions. He believed that she needed continued counseling. The mother then began seeing Dr. Mahesh Gupta, a therapist of her choice whom she paid a nominal fee, "off and on." She saw Dr. Gupta for approximately ten sessions during 1996. The mother saw a third therapist, Ken Denny, from February 1997 through April 1997 for ten visits. Denny testified that the mother made some progress in the area of anger management and appropriate behavior when "dealing with authority figures," but when scheduled therapy concluded after ten sessions, he believed further therapy was required. The mother did see Denny for five more sessions and then another therapist, who did not testify at trial. After 20 visits, however, Denny believed that additional counseling was needed for the mother "to be able to adequately parent the children."
Although this shows that at least one of the mother's counselors observed some progress toward the goal of anger and hostility management, evidence to the contrary was also presented. In September 1997, Officer Victor Jones of the Liberty County Sheriff's Department was working in an off-duty capacity at a restaurant around 3:00 a.m., when he was summoned inside concerning "an unruly customer."[1] The waitress reported that the customer, the mother in this case, had been "verbally abusive" and "physically menacing" and that she had asked her to leave the restaurant because of her inappropriate dress. Officer Jones recognized the mother when he entered the restaurant because he had seen her earlier in the evening "involved in a verbal altercation" with a man. He asked the mother to leave until she was appropriately dressed, and she responded by cursing at him.
After Jones escorted the mother outside, she "continued to be belligerent and uncooperative." Because of this conduct, Jones told her she was under arrest for disorderly conduct, and she walked away, refusing to comply with Jones's commands to stop. He caught and began to handcuff the mother, and she struck him in the face. Jones stated that it took himself and three or four other *473 officers to place her in a police vehicle "because she was belligerent and uncooperative and fighting." The officers finally succeeded in placing her in the vehicle after spraying her with pepper spray, "which didn't have a visible effect," and she kicked out the window of the car. Jones stated he "could smell a strong odor of alcohol about her." The mother pled guilty to charges of obstruction of an officer, damage to government property, and disorderly conduct arising out of this incident. She was apparently sentenced only to probation but served some time in jail because her probation was revoked on her sentence for the previous cruelty to children conviction.
Evidence was also introduced concerning other incidents of violence involving the mother. In August 1996, after G.S. and I.S. had begun overnight visits with their mother, her caseworker visited the mother's home and saw stitches in the mother's nose. She also observed two broken windows. The mother initially would not explain to the caseworker what happened, but later told her that she had been in a fight with three other women at a club and that the women came to her home and broke her windows. The mother told her caseworker that her children were not in danger after this incident, however, indicating that she carried a weapon in her purse. Also, once when G.S. and I.S. were visiting with the mother in her home, she and a man began what she referred to as horseplaying, but the man became serious and began to threaten her. Eventually during this incident a window was broken.
Finally, we note that evidence was presented concerning problems experienced by both G.S. and I.S. After G.S. was placed into the custody of DFACS, a heart murmur was discovered. The mother did not attend a doctor's appointment concerning this condition. As for I.S., at one point after being taken from the mother he was institutionalized at Georgia Regional Hospital. His foster mother testified that when she brought him from this institution, he was in "bad shape" and that it took "weeks to stabilize him." He could not attend regular school because of behavior problems. According to his foster mother, I.S. fought, kicked, screamed, and butted his head. His behavior improved during his stay with this witness, however. The mother's caseworker stated that she believed a suitable adoptive home for the children had been found.
Under OCGA § 15-11-81(a), the decision to terminate a parent's rights is a two-step process. The juvenile court must first determine whether clear and convincing evidence of parental misconduct exists, and if so, whether termination is in the best interest of the child, "after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home." OCGA § 15-11-81(a). A determination of parental misconduct or inability must be supported by evidence showing the following factors: the child is deprived; the parent's lack of proper parental care or control caused the deprivation; the cause of deprivation is likely to continue; and continued deprivation will or may cause "serious physical, mental, emotional, or moral harm to the child." OCGA § 15-11-81(b)(4)(A)(i)(iv).
On appeal of a juvenile court's decision to terminate parental rights, we view the evidence in a light most favorable to the juvenile court's judgment, and we determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights have been lost. In the Interest of C.D.F., 222 Ga.App. 905(1), 476 S.E.2d 654 (1996). So viewing the evidence presented below, we conclude that the evidence was sufficient to support the juvenile court's findings and decision to terminate the mother's parental rights.
First, sufficient evidence of the mother's parental misconduct or inability was presented. The previous unappealed orders of the juvenile court, particularly the September 1993 order entered following the admission of G.S. to the hospital emergency room for severe burns, established that I.S. and G.S. were deprived. C.D.F., supra at 907, 476 S.E.2d 654. And the mother's guilty plea to charges of cruelty to children arising out of the incident, although she continues to deny that she intentionally injured G.S., shows that her conduct was the cause of the *474 deprivation, as required by OCGA § 15-11-81(b)(4)(A)(ii). See generally In the Interest of R.M., 232 Ga.App. 727, 728, 503 S.E.2d 635 (1998) ("obvious link" between parents' physical abuse of children and criminal convictions). Her conduct toward G.S. certainly was "egregious" and constituted substantial evidence that G.S.'s injury "resulted from parental neglect or abuse," factors the juvenile court was authorized to consider when making its decision. See OCGA § 15-11-81(b)(4)(B)(iv), (vi).
Lack of proper parental care or control by the mother also was shown by her failure to complete the goals of her reunification plan. See generally In the Interest of J.M.B., 231 Ga.App. 875, 878(1)(b), 501 S.E.2d 259 (1998). She may have completed some of the goals, such as attending parenting classes and visiting with the children on a fairly regular basis, and her caseworker testified that she sometimes made progress toward completing the goals. We also note the mother's testimony that she had career goals, as well as testimony by her caseworker that she attended college and was employed "off and on" throughout the five years between the time DFACS took custody of her children and the time of the hearing.
But evidence also was presented of the mother's failure to make progress toward all goals of the plan. She did not, for example, attend all scheduled visitations and often was late, even for her last visit before the hearing. Her caseworker testified that other activities often seemed to take priority over the mother's children. And although the mother did receive counseling as required by her case plan, evidence was presented that further counseling was necessary before she would be ready to care for her children. Furthermore, the mother was often uncooperative and hostile toward her therapists and caseworkers. In fact, the mother's hostile attitude often manifested itself in violence, as shown by her interaction with Officer Jones several months before the hearing, her fight with other females, and the violence that occurred in her home involving a man when her children were present.
These same factorsthe mother's continued failure to comply with the reunification plan and especially her repetitive outbursts of violenceshow that the deprivation is not likely to be remedied. OCGA § 15-11-81(b)(4)(A)(iii). And the mother's violent behavior shows that continued deprivation could cause serious physical harm to the children. OCGA § 15-11-81(b)(4)(A)(iv). The juvenile court was not required to return the children to their mother until they suffer "the seemingly inevitable serious injury or death. [Cit.]" In the Interest of K.R.C., 235 Ga.App. 354, 355(1), 510 S.E.2d 547 (1998).
Finally, the evidence was sufficient to show that termination was in the best interest of the children. The same factors showing the existence of parental misconduct or inability can support a finding that termination of parental rights would be in the child's best interest. See, e.g., In the Interest of B.P., 207 Ga.App. 242, 245, 427 S.E.2d 593 (1993). The mother's failure to comply with the terms of her reunification plan and her outbursts of violence clearly support the conclusion that termination would be in the best interest of the children. Furthermore, the mother's caseworker testified that G.S. and I.S. needed a stable and permanent home and that they had been moved from home to home several times after DFACS took custody. It is well settled that when considering the best interest of a child or children the juvenile court is authorized to "consider their need for stability and the harmful effects of prolonged foster care." (Citation omitted.) In the Interest of D.A.P., 234 Ga.App. 257, 260, 506 S.E.2d 438 (1998). In addition, the best interest of the children would be served by termination of the mother's parental rights, as evidenced by I.S.'s belligerent and difficult behavior before and after his visits with the mother. After reviewing the evidence in the light most favorable to the mother, a rational trier of fact could have found clear and convincing evidence that her rights had been lost.
Judgment affirmed.
POPE, P.J., and ELDRIDGE, J., concur.
NOTES
[1] This incident occurred approximately ten months before the mother's termination hearing.