531 S.E.2d 117 (2000)
242 Ga. App. 698
In the Interest of C.P., a child.
No. A99A2144.
Court of Appeals of Georgia.
March 10, 2000.
*118 Wanda G. Johnson, Forsyth, for appellant.
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Laura W. Hyman, Assistant Attorneys General, W. Ashley Hawkins, Forsyth, for appellee.
BARNES, Judge.
The Juvenile Court of Monroe County terminated the parental rights of the father of C.P. The father appeals, arguing that the juvenile court's decision was not supported by clear and convincing evidence. For the reasons that follow, we affirm.
In reviewing the father's challenge to the sufficiency of the evidence, we determine whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found by clear and convincing evidence that the natural father's rights to custody have been lost. In the Interest of A.C., 230 Ga.App. 395, 396(1), 496 S.E.2d 752 (1998). We do not weigh the evidence or determine witness credibility but *119 defer to the juvenile court's factfinding. In the Interest of L.H., 236 Ga.App. 132, 133(1), 511 S.E.2d 253 (1999).
Viewed in this light, the evidence shows that C.P. was born on May 13, 1993. On August 17, 1993, he came into the custody of the Department of Family & Children Services ("DFACS") after DFACS received a report that his mother had left him alone. DFACS placed C.P. with his maternal grandmother until October 1995, when she became unable for health reasons to keep him. His natural father had begun visiting him and paying child support six months earlier and sought physical custody of the child. DFACS approved the father's residence, and the juvenile court placed physical custody of C.P. with his father, under DFACS' supervision.
For reasons that are not clear from the record, DFACS removed C.P. from his father's residence a year later, in October 1996, and returned him to his maternal grandmother. Once again, the grandmother's health deteriorated, and in April 1997, C.P. was placed in foster care, where he has remained. In January 1998, DFACS petitioned the juvenile court to terminate the parental rights of C.P.'s natural father and natural mother. In April 1998, the father legitimated C.P. After a hearing in November 1998, the juvenile court terminated the mother's rights, but not the father's.
At the November 1998 hearing, a foster care worker with Spalding County DFACS testified that she evaluated the father's home for placement and did not approve it. The three-bedroom house did not have adequate space for C.P., with the grandfather of the father's wife in one bedroom, her grandmother in another bedroom, and the father, his wife, and their two children in the third bedroom. The foster care worker also testified that she observed the father's five-year-old stepdaughter dipping snuff; when asked about it, the father was not concerned and responded that the child had been dipping snuff since she was two or three. Further, none of the adults in the house returned a signed form allowing the foster care worker to check their criminal backgrounds.
A caseworker with the Monroe County DFACS testified that the father did not visit regularly, had not paid support regularly, and indicated that he did not intend to move from the house that had been evaluated as unsuitable. However, she also testified that C.P. was attached to his father and that he gets excited when he knows his father is coming and goes to him voluntarily. While the father cooperated with the agency as far as visitation, he did not cooperate as far as letting them know where he was living or working.
The father testified that he had attended every hearing concerning C.P. that he knew about except one. As a result of missing that hearing, he said, a bench warrant was issued for contempt, he spent ten days in jail, he lost his job, and DFACS regained physical custody of C.P. He had made three child support payments in four and a half months and was $2,500 in arrears. He explained that he had not signed the criminal background check form because he did not have time before the investigator went on vacation. He further testified that he was going to move into a two-bedroom apartment at the end of the week, which would be occupied by two adults and three children. Finally, he disputed the caseworker's testimony that he had missed seven out of fifteen visits scheduled in the previous sixteen months.
C.P.'s guardian ad litem testified that, while he recommended terminating the mother's parental rights, he was hesitant to recommend the same for the father. The guardian thought the father had made some attempts to do what he needed to do, had legitimated C.P., and had established a relationship with him.
In an order dated November 9, 1998, the juvenile court terminated the parental rights of C.P.'s mother. That issue is not before us in this case. On the same day, the juvenile court signed an order prepared by the father's attorney that declined to terminate the father's parental rights. The order included factual findings that the father testified that he had located another place to live with adequate room for C.P.; that he had only one criminal conviction, which occurred when he was a juvenile; and that he had contacted *120 the appropriate agency to begin catching up on his child support now that he was working full-time. The court also noted that the record contained no evidence that the father had abused alcohol or drugs.
In January 1999, DFACS again petitioned the juvenile court to terminate the father's parental rights. At a hearing in March 1999, a supervisor with the Monroe County DFACS testified that after the November 9, 1998 hearing, the department sent the father a letter at his last known address, scheduling a visit for November 18, 1998. He did not appear for that visit but did appear at a Citizens Panel Review on November 20, at which he explained that he had moved and had a new address. He also informed the supervisor that he had filed for a divorce. DFACS sent him a letter on November 25, scheduling a December 9 visit, but he did not appear. C.P.'s mother appeared on that day for a scheduled visit with C.P.'s half-siblings and advised DFACS that the father had been arrested on December 3 and was in jail. As of the hearing date, the father had not contacted the department since the November 20, 1998 Citizens Panel Review. He also had not called or written to the child since he was incarcerated.
A Griffin police officer testified that he had arrested the father on December 3, 1998, for misdemeanor marijuana possession. At the time of this arrest, the father had an outstanding arrest warrant against him for probation violations, which was issued in February 1998. The father had been placed on probation after pleading guilty in August 1989, when he was 17, to a felony charge of entering an automobile with intent to commit theft and failure to report an accident. He was not charged as a juvenile but pled guilty as an adult in superior court. The father's probation officer testified at the termination hearing that, once the possession charge was resolved, he would schedule a probation revocation hearing. Finally, the probation officer testified that the father has approximately two years left on his 1989 sentence.
A special agent with the Griffin/Spalding County Narcotics Task Force testified that the father had been convicted of affray in 1996 and was given four years on probation.
The father testified that his December 1998 arrest resulted from his holding a bag of marijuana to use and share at a party. He admitted that if he had smoked marijuana at the party, he would probably have failed an employment-related drug test and lost his job. He had no idea how much time was left on his probation and testified that if the remainder of his probation was revoked, he would let his stepmother and father care for C.P. until he was released. He separated from his wife some time between the November 9, 1998 termination hearing and his December 3, 1998 arrest, and now has a girlfriend. Finally, he admitted he had pled guilty to a charge of affray a few years earlier and received three months of probation.
In his response to the second termination petition, C.P.'s guardian ad litem reported that evidence and testimony the father presented at the first termination hearing, "including criminal records, failure to cooperate with DFACS, and failure to properly advise the Court of pending criminal matters," appeared "to have been given or withheld in an attempt to persuade or incline the Court to avoid termination of the father's parental rights and was misleading and fraudulent to the Court and all parties at that time." The guardian recommended terminating the father's parental rights.
The juvenile court terminated the father's parental rights in an order dated April 16, 1999. In its order, the court stated it had taken judicial notice of "the entire file" from the previous termination case as well as "the entire case." The court's findings of fact included examples of the father's misconduct and inability to provide properly for C.P. that were presented at the first termination hearing, as well as evidence presented at the second termination hearing. In its order, the court noted that "[a]t the previous hearing, the father stated that he had not been in trouble since he was a juvenile. He lied to the Court." The court also noted testimony that C.P. has been in custody almost his entire life and needs permanency. The father has moved on many occasions and not informed DFACS, is now separated from his wife and is in jail. The court concluded that *121 it would be in C.P.'s best interest to terminate the natural father's parental rights.
On appeal, the father enumerates five errors, challenging the sufficiency of the evidence before the juvenile court.
1. Determining whether parental rights should be terminated involves a two-step analysis. In the first step, the court must find parental misconduct or inability. That finding must be supported by clear and convincing evidence that: (i) the child is deprived; (ii) lack of proper parental care or control caused the deprivation; (iii) the cause of the deprivation is likely to continue; and (iv) continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. OCGA § 15-11-81(b)(4)(A)(i)-(iv); In the Interest of L.H., supra, 236 Ga.App. at 132-133(1), 511 S.E.2d 253. Further, "[e]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of present unfitness is required." (Citations, punctuation and emphasis omitted.) In the Interest of R.A., 226 Ga.App. 18, 20, 486 S.E.2d 363 (1997); see also In the Interest of D.C.N.K., 232 Ga.App. 85, 90, 501 S.E.2d 268 (1998).
If these four factors exist, then the court must take the second step and determine whether terminating parental rights is in the best interest of the child, considering the child's physical, mental, emotional and moral condition and needs, including the need for a secure, stable home. OCGA § 15-11-81(a).
We review the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found by clear and convincing evidence that the natural father's right to custody has been lost. In the Interest of A.C., supra, 230 Ga.App. at 396, 496 S.E.2d 752.
2. The father's challenge on appeal to the juvenile court taking judicial notice of the previous case record, which was introduced at the March 26, 1999 hearing, is waived for failure to object at the hearing. In the Interest of M.L.P., 236 Ga.App. 504, 510(2), 512 S.E.2d 652 (1999).
3. In this case, ample clear and convincing evidence of the four factors established parental misconduct or inability.
(a) First, the evidence showed that C.P. was a "deprived" child. A deprived child is defined as a child who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals." OCGA § 15-11-2(8)(A).
The definition of a deprived child, as contained in OCGA § 15-11-2(8), focuses upon the needs of the child regardless of parental fault. The petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue.
(Citation, punctuation and emphasis omitted.) In the Interest of J.P., 267 Ga. 492, 480 S.E.2d 8 (1997). Based on the facts outlined above, sufficient clear and convincing evidence supports the juvenile court's finding that C.P. was deprived.
(b) The second factor to consider is whether the father's lack of parental care or control caused C.P.'s deprivation. After the termination hearing in November 1998, C.P.'s father failed to visit him regularly or pay support because he had been arrested and jailed for marijuana possession.
In determining whether the child is without proper parental care and control, the court shall consider ... [the] [c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship.
OCGA § 15-11-81(b)(4)(B)(iii).
Although criminal conviction and incarceration do not always compel termination of parental rights, serving time as a convicted felon will support a termination of parental rights when adequate aggravating circumstances are shown to existsuch as failure to comply with goals for family reunification or failure to provide parental care and support.
In the Interest of R.H., 240 Ga.App. 551, 553(2), 524 S.E.2d 257 (1999).

*122 These aggravating circumstances may include a criminal history of repetitive incarcerations for the commission of criminal offenses or parole violations, which constitutes an additional factor which may be considered in determining whether the child presently is without the proper parental care and control of the offending parent, and that such is likely to continue.
(Citations, punctuation and emphasis omitted.) In the Interest of B.C., 235 Ga.App. 152, 154, 508 S.E.2d 774 (1998). We conclude that clear and convincing evidence supports the conclusion that the father's lack of parental care or control caused C.P.'s deprivation.
(c) Third, in determining whether the child's deprivation is likely to continue, the juvenile court may consider the parent's past conduct. In the Interest of A.C., 234 Ga.App. 717, 719, 507 S.E.2d 549 (1998). The juvenile court specifically found that the father lied about his criminal record in the earlier termination hearing; therefore, his credibility as to other matters was questionable, such as his plans for renting an apartment. The evidence showed that the father did not visit regularly, having seen C.P. only seven out of fifteen visits scheduled during the sixteen months preceding the November 1998 hearing. He did not pay support regularly, having testified that he was at least $2,500 in arrears and had made only three of eighteen weekly payments before the November 1998 hearing. He did not maintain a stable home; between the November 1998 hearing and the March 1999 hearing, he had separated from his wife, moved, and had a new girlfriend. With the exception of legitimating C.P., the father failed to do anything affirmative to remedy the circumstances that led to C.P.'s deprivation five years earlier. Further, the father's probation officer intends to seek revocation of the father's remaining two years on probation for a felony. The father conceded at the March 1999 termination hearing that if his probation was revoked, he would not be able to take care of C.P. while in jail. Sufficient clear and convincing evidence supports the juvenile court's finding that C.P.'s deprivation is likely to continue.
(d) Fourth, clear and convincing evidence showed that continued deprivation likely would harm C.P. Based on the evidence of the father's past behavior and his inability to comply with significant requirements of the reunification plan, we find that a rational factfinder could have found by clear and convincing evidence that C.P.'s continued deprivation would have a detrimental effect on him. The caseworker testified that C.P. needs permanency, and his foster parents cannot adopt him due to their age. The older C.P. gets, the harder it will be to find adoptive parents.
4. As to the second prong of the termination analysis, the evidence also was sufficient to show that termination of the father's parental rights was in C.P.'s best interest. We have held that "the court may consider the child's need for a stable home environment and the detrimental effects of prolonged foster care. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." (Citations omitted.) In the Interest of J.O.L., 235 Ga.App. 856, 858, 510 S.E.2d 613 (1998). Here, the evidence showed that C.P. needs a stable home and could be harmed by prolonged foster care. In addition, the same factors that show the father's inability to care for his child support a finding that termination of parental rights would be in C.P.'s best interest. Id. Accordingly, we affirm the order of the juvenile court terminating the parental rights of C.P.'s father.
Judgment affirmed.
BLACKBURN, P.J., and ELDRIDGE, J., concur.