553 S.E.2d 647 (2001)
251 Ga. App. 132
In the Interest of M.C.L., a child.
In the Interest of M.B.W. et al., children.
Nos. A01A1336, A01A1337.
Court of Appeals of Georgia.
August 8, 2001.
*648 McNally, Edwards, Bailey & Lander, Decatur, Lisa A. Redlin, Atlanta, Joseph S. Rhymer, Loganville, for appellants.
Thurbert E. Baker, Atty. Gen., Dennis R. Dunn, Deputy Atty. Gen., William C. Joy, Senior Asst. Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Dist. Attys. Gen., John R. Laseter, for appellee.
MILLER, Judge.
Married twice, Karen bore a son by each husband. Evidence showed that Karen and her second husband were repeatedly incarcerated and that they failed to comply with case reunification plan goals. The question on appeal is whether this evidence authorized the juvenile court to terminate their parental rights to the two boys. We hold that the evidence sufficed to sustain this judgment and therefore affirm.
Karen was sentenced in 1992 to twenty years for her participation with her first husband in murder and armed robbery and was forced to leave her nine-month-old boy M.B.W. in the care of relatives. While in prison, she divorced her first husband (who was serving a life-plus-twenty sentence for his part in the crimes) and married Scott in 1996, whom she had met in prison. Paroled in 1995, Scott had been serving his second prison sentence for drug dealing (not counting previous sentences for credit card fraud and drug possession).
When Karen was paroled in August 1996, the couple moved with M.B.W. to Snellville for about a year and then to Swainsboro for another year. There M.C.L. was born in March 1998. While in Swainsboro, Scott was arrested and sentenced to twelve months *649 probation for theft by taking, and Karen herself spent two days in jail. Later in 1998, the family moved to the Loganville/Snellville area, living in two motels (with the exception of some months when Karen and the boys lived elsewhere during a temporary separation of the couple). They had only sporadic employment.
In January 1999, Scott was incarcerated for a week for theft by deception and for a probation violation. A month later he was incarcerated for several weeks for a probation violation. Once out, he was soon imprisoned for three months for driving with a suspended license and other traffic violations. In the middle of this latest imprisonment, Karen herself was incarcerated on May 26 for writing bad checks. As no relative was available to care for the children, the Walton County Department of Family & Children Services (DFACS) took custody and placed them in foster care. The parents agreed to a reunification plan that required (1) Scott to become and remain alcohol and drug free, (2) both parents to obtain and maintain stable housing six months, (3) both parents to obtain and maintain stable employment for six months, and (4) both parents to visit the boys regularly. When released in June, the parents for the next two months lived in a car, an employer's basement, motels in Macon and Monroe, and with relatives. No consistent employment was maintained.
In early August, Karen was incarcerated for shoplifting and for writing bad checks and remained in jail until mid-October. Meanwhile, Scott was again arrested for driving with a suspended license and was imprisoned from September until October. A week after Karen was released, she was again imprisoned for writing bad checks and stayed in prison from October 20 until November 10. Upon Scott's release, he found employment and began living in his employer's residence, and upon Karen's release, she went to live with her mother.
On December 28, Scott was imprisoned for forging some of his employer's checks, which Karen cashed. Karen had her parole revoked, with forgery charges against her pending upon her release. The couple have remained in prison since.
Due to their repeated imprisonments and noncompliance with the reunification plan, DFACS in June 2000 petitioned to terminate Karen and Scott's parental rights to M.C.L. and her parental rights (as well her first husband's parental rights who was still serving the life plus-20 sentence) to M.B.W. The court granted the petition with regard to Scott and Karen but denied it with regard to the first husband. Asserting insufficiency of the evidence, both Scott (Case No. A01A1336) and Karen (Case No. A01A1337) have appealed.
1. The statutory scheme for terminating parental rights involves a two-step analysis in which the court determines first whether there is clear and convincing evidence of parental misconduct or inability and second whether termination of parental rights is in the best interests of the children.[1]
In deciding whether there was parental misconduct or inability, the trial court determines whether the evidence shows that (i) the children are deprived, (ii) lack of parental care caused the deprivation, (iii) such is likely to continue, and (iv) the continued deprivation is likely to cause serious harm to the child.[2]
Here Karen and Scott do not contest that the first two factorsthat the children are deprived and lack of parental care caused this deprivationwere shown. Indeed, they stipulated that their respective ongoing incarcerations had caused the children to be deprived. Moreover, neither had appealed earlier orders finding the children to be deprived.[3] Rather, they argue that the third and fourth factors were not shown.
(a) Cause of Deprivation Likely to Continue. The third factor is whether the *650 cause of the deprivation is likely to continue.[4] At the time of the termination hearing in September 2000, both parents still had lengthy sentences to serve, with only their hope that they might be released early on parole late in 2001. Parole hopes are nothing more than conjecture.[5] Moreover, Karen conceded she still had to face forgery charges upon her release.
A parent's incarceration does not always compel the termination of parental rights, but it can support a termination when there are sufficient aggravating circumstances present.[6] "These aggravating circumstances may include a history of incarcerations for repeated criminal offenses and a determination that it is likely such criminal history will continue upon release."[7] Indeed, "[r]epeated incarceration preventing one from caring for a child indicates a likelihood of continued deprivation."[8] Both parents here have a long history of incarceration for commission of criminal offenses and for parole violations, which misconduct continued even after DFACS took over custody of the children. Their past conduct provided sufficient evidence for the court to find that such was likely to continue.[9]
Moreover, another aggravating factor when the parents are incarcerated is failure to comply with goals in the case reunification plan.[10] Repeated failure to comply with these goals may show that the cause of the deprivation is likely to continue.[11]
Here the parents failed dismally to meet the case plan's four goals. The first goal required Scott to be drug free, with subsidiary goals of obtaining an evaluation by July 16, 1999, being completely honest regarding his drug use, and following all recommendations for treatment. At the termination hearing Scott admitted that his present incarceration was because he had relapsed into drug use in December 1999, which led to his forging his employer's checks for drug money. Indeed, his use of cocaine had been the primary cause for many of the family's instability problems, including his actions and arrests since the plan was agreed upon. He did not obtain a drug evaluation until November 1999, four months after the deadline set in the case plan. He has never received any formal treatment nor been to Alcoholics Anonymous or Narcotics Anonymous. He admitted to being dishonest about his drug use after his agreeing to the case plan. Despite the goal in the case plan and despite the evaluation, he relapsed in December, leading to his present incarceration.
The second goal was for Scott and Karen to obtain and maintain stable employment for six months. They were to provide DFACS with evidence of such. During the few months they were not in prison following the institution of the case plan, neither obtained steady employment nor provided DFACS with evidence of steady employment. The one solid job Scott obtained he forfeited when he stole from his employer.
The third goal was to obtain and maintain appropriate and stable housing by July 31, 1999. During those few months they were not in prison, the parents lived in a car, in an employer's basement, in Macon hotels, with her mother in a trailer park, in the Monroe Motor Inn, and at a second employer's house.
The fourth goal was to visit the children on regular and scheduled dates. Of the fifteen *651 visits scheduled between June and December 1999, Karen missed nine and Scott missed five. In our view, there was ample evidence for the court to find that none of the case plan goals were met and that such noncompliance was likely to continue.
(b) Continued Deprivation Likely to Cause Harm. The fourth factor is whether the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children.[12] Here the caseworker testified that the children, who had been drifting for 16 months in foster care, needed permanency, something that was also sorely lacking in these parents' care of the children. She testified to the great emotional trauma suffered by these children who were in limbo. Since they had been cared for by others for most of their lives, they had little relationship with their parents. Indeed, during the nine months of incarceration immediately preceding the termination hearing, Karen had written only four letters to M.B.W. and none to M.C.L., and Scott had written no letters. When free, Scott had twice engaged in drug deals with M.B.W. present, showing moral harm. Physical harm was shown by evidence that when taken into custody by DFACS, the children were not up-to-date on their immunizations and needed dental work, and one had an untreated ear infection.
"The juvenile court was authorized to consider the adverse effects of prolonged foster care in determining that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children."[13] Indeed, "[c]hildren need permanence of home and emotional stability or they are likely to suffer serious emotional problems."[14] A caseworker's testimony about the need for permanency may be considered.[15] The evidence sufficed on this factor.
2. The second area of inquiry is whether termination of rights was in the best interests of the children.[16] "The same factors showing the existence of parental misconduct or inability can support a finding that termination of parental rights would be in the child[ren's] best interest[s]."[17] Thus, as with the "harm" factor set forth above, in determining the best interests of the children, a court may consider their need for a stable home environment and the detrimental effects of prolonged foster care.[18] "Moreover, the DFACS caseworker testified that [the children were] very bonded to the foster parents, who for the last two years have provided a loving and nurturing environment and have expressed interest in adopting [them]."[19] The evidence sufficed to uphold the court's finding that termination was in the children's best interests.[20]
Judgments affirmed.
ANDREWS, P.J., and ELDRIDGE, J., concur.
NOTES
[1] OCGA § 15-11-94(a).
[2] OCGA § 15-11-94(b)(4)(A); In the Interest of K.D.S., 237 Ga.App. 865(1), 517 S.E.2d 102 (1999).
[3] See In the Interest of E.C., 225 Ga.App. 12, 14-15, 482 S.E.2d 522 (1997) (parent bound by earlier unappealed findings of deprivation).
[4] OCGA § 15-11-94(b)(4)(A)(iii).
[5] Stills v. Johnson, 272 Ga. 645, 651-652(3), 533 S.E.2d 695 (2000); In the Interest of D.A.P., 234 Ga.App. 257, 260(2), 506 S.E.2d 438 (1998).
[6] Stills, supra, 272 Ga. at 651(3), 533 S.E.2d 695; In the Interest of S.K.L., 199 Ga.App. 731, 733(1), 405 S.E.2d 903 (1991).
[7] (Footnote omitted.) Stills, supra, 272 Ga. at 651(3), 533 S.E.2d 695.
[8] (Footnote omitted.) In the Interest of B.C., 235 Ga.App. 152, 155(b), 508 S.E.2d 774 (1998); see S.K.L., supra, 199 Ga.App. at 733(1), 405 S.E.2d 903.
[9] See B.C., supra, 235 Ga.App. at 155, 508 S.E.2d 774(b).
[10] In the Interest of D.T.C., 248 Ga.App. 788, 791 (2)(b), 548 S.E.2d 11 (2001); In the Interest of C.P., 242 Ga.App. 698, 703(3)(b), 531 S.E.2d 117 (2000).
[11] C.P., supra, 242 Ga.App. at 704(3)(c), 531 S.E.2d 117.
[12] OCGA § 15-11-94(b)(4)(A)(iv).
[13] (Citation omitted.) In the Interest of R.M., 232 Ga.App. 727, 728-729, 503 S.E.2d 635 (1998); accord In the Interest of B.R.W., 242 Ga.App. 232, 237-238(2), 530 S.E.2d 5 (2000).
[14] In the Interest of J.O.L., 235 Ga.App. 856, 858, 510 S.E.2d 613 (1998); accord D.T.C., supra, 248 Ga.App. at 792(3), 548 S.E.2d 11.
[15] C.P., supra, 242 Ga.App. at 704(3)(d), 531 S.E.2d 117; accord In the Interest of I.S., 238 Ga.App. 304, 309, 520 S.E.2d 470 (1999).
[16] OCGA § 15-11-94(a).
[17] (Citation omitted.) I.S., supra, 238 Ga.App. at 309, 520 S.E.2d 470.
[18] D.T.C., 248 Ga.App. at 792(3), 548 S.E.2d 11; accord C.P., supra, 242 Ga.App. at 704(4), 531 S.E.2d 117; I.S., supra, 238 Ga.App. at 309, 520 S.E.2d 470; see generally In re G.M.N., 183 Ga.App. 458, 461(1), 359 S.E.2d 217 (1987).
[19] (Citation omitted.) K.D.S., supra, 237 Ga. App. at 867(2), 517 S.E.2d 102.
[20] Id.