686 S.E.2d 478 (2009)
In the Interest of T.L.H. and O.D.H.
No. A09A1177.
Court of Appeals of Georgia.
November 13, 2009.
*479 David W. Brookshire, Cartersville, for Appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Sr. Asst. Atty. Gen., Lorie A. Moss, Elizabeth M. Williamson, Asst. Attys. Gen., Mary F. McCord, for Appellee.
BARNES, Judge.
We granted the father of T.L.H. and O.D.H.'s application for discretionary review of the order of the juvenile court terminating his parental rights. In his appeal, the father contends that there was no clear and convincing evidence of his present unfitness; that the juvenile court erred in terminating his parental rights because he complied with his case plan; and that the termination was not in the best interests of his children. Upon our review, we affirm.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to *480 custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.
(Footnotes omitted.) In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001).
So viewed, the evidence shows that T.L.H. and O.D.H. were taken into the custody of the Bartow County Department of Family and Children Services ("DFACS") on January 24, 2006 after their mother stabbed her boyfriend in their presence. DFACS obtained a shelter care order for the children, and after a 72-hour hearing, the trial court found T.L.H. and O.D.H. deprived. It was noted at the hearing that the father's whereabouts were unknown until the day of the hearing, and that he was incarcerated. The juvenile court found probable cause that the children were deprived because of the mother's unresolved legal issues, "possible maternal involvement" in the sexual abuse of one of the children, anger issues, and failure to participate in a safety plan. In the subsequent temporary order of adjudication and disposition, the father stipulated that the causes of the children's deprivation as related to him were his incarceration and failure to legitimize T.L.H. and O.D.H. The order also noted that one of the children suffered from severe post traumatic stress disorder and both children were in counseling. The juvenile court ordered that for purposes of reunification the father must legitimate and establish paternity to the children and "resolve all pending legal issues and commit no further violations of the law." The father was not present for the hearing but was represented by counsel.
The temporary order was finalized on April 18, 2006 following a hearing at which the father was present. A supplemental order following an April 2006 judicial citizen review panel reflected a permanency plan of reunification, noted that both parents were incarcerated, and continued custody of the children with DFACS. On September 26, 2006, the juvenile court entered an order granting the father's petition to legitimate T.L.H. and O.D.H. The supplemental order following an October 2006 judicial citizen review panel indicated that the permanency plan was still reunification with the parents, that the legitimation was complete, and that the parents remained incarcerated. Though the current placement was the same, it was noted that the children were to be moved to a relative's home.
A January 23, 2007 order extending DFACS's custody of the children until January 2008 found that because of the parents' continued incarceration, reunification was inappropriate, and concluded that the children remained deprived. The permanency plan was placement with a relative. A supplemental order following a second judicial citizen review panel on April 18, 2007 reiterated the findings of the earlier order, including that the parents were incarcerated and unable to meet the children's needs. DFACS apparently filed a motion for nonreunification, which is not included with the record, that came before the court in a hearing on July 9, 2007. The hearing was continued until November 27, 2007 because the mother had "started to work on her reunification plan," and DFACS wanted to give the mother additional time to complete her case plan.
The supplemental order following an October 17, 2007 judicial citizen review panel noted the upcoming hearing on the motion for nonreunification, and further noted that the revised permanency plan was reunification concurrent with "adoption/placement with a fit and willing relative." Following the hearing on the motion for nonreunification, the juvenile court entered an order of adjudication and disposition, finding that the boys continued to be deprived because of the father's incarceration and the mother's failure to address her substance abuse and other issues. The Court also noted that DFACS intended to petition for termination of the parental rights by March 2008.
The juvenile court entered an order following the April 16, 2008 judicial citizen review panel which reflected that DFACS had not filed a termination petition and directed the agency to "explain its permanency plan if it does not plan to file a [termination petition]." Both parents remained incarcerated. DFACS thereafter filed a petition for termination *481 of the parental rights on June 12, 2008.
At the termination hearing the father was present and represented by counsel. The psychologist who was currently treating the boys testified that thirteen-year-old T.L.H. was severely sexually abused between the ages of four and nine by multiple parties, with the most extreme abuse involving anal penetration committed by a great-uncle. T.L.H. had been diagnosed with major depressive disorder, anxiety disorder, borderline intellectual functioning, selective mutism, and sexual abuse of a child as a victim. The psychologist testified that T.L.H. did not trust adults and did not engage in relationships with adults for fear of being betrayed or hurt. He would need long-term therapy and the uncertainty inherent in foster care was impeding his therapeutic progress, and would do so until he had closure. The psychologist who had evaluated T.L.H. in 2006 and 2008 testified that he was concerned that the child would later present with a serious mental illness "along the lines of something like psychotic disorder because what selective mutism suggests is a complete psychological deterioration."
The treating psychologist testified that nine-year-old O.D.H. had seen his mother stab her boyfriend, and heard his brother's screams when he was being sexually abused. He further testified that the child used intimidation and violence in order to feel more powerful and in control of his life. The evaluating psychologist testified that O.D.H. had exhibited behavioral decomposition since the 2006 evaluation. The child was "getting overwhelmed," and was "lashing out at others, and exhibiting clear signs of sadness." O.D.H. was diagnosed with dysthymic disorder and disruptive behavior disorder. Their treating doctor testified that termination of the parental rights was in the boys' best interests.
The DFACS placement worker testified that the father never corresponded with the boys in the over two years that she was assigned to them. He had contacted DFACS only once in May 2006 requesting that the agency send something to his parole officer. She testified that the relative adoption options had been unsuccessful, but that two families in other counties were possibilities, and another family is open to adopting the boys if they are legally free. The guardian ad litem added her recommendation that the parental rights be terminated, because the children "just don't have any more time."
The father testified that he pled guilty to aggravated assault on November 8, 2004 and was sentenced to fifteen years, five to serve and the balance on probation. He had been in jail continuously, however, since November 10, 2003. The father testified that he would be released from prison in June 2009, and that he deserved a chance with his children. He acknowledged that he had not communicated with the children, but testified that he did not have the address and did not know where the boys were. The father further testified that he took a year-long anger management class in prison, that he and the children could live with his sister when he got out of prison, and that he worked in construction, but would take any job he found when he got out of prison.
Based on this evidence, the juvenile court terminated the parental rights, finding specifically as to the father that
[his] current imprisonment for the felony of aggravated assault has had a demonstrably negative effect on the quality of the parent-child relationship. The Court specifically finds that [the father] has failed for more than a year prior to the filing of the petition for termination of parental rights to develop and maintain a parental bond with the children in a meaningful and supportive manner.
OCGA § 15-11-94 sets forth the relevant procedure for considering the termination of parental rights. First, the court must determine whether there is clear and convincing evidence of parental misconduct or inability. OCGA § 15-11-94(a). If there is, the court must then consider whether termination of parental rights is in the best interest of the child. Id. The court determines parental misconduct or inability by finding that (1) the child is deprived; (2) the lack of parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; *482 and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child. OCGA § 15-11-94(b)(4)(A).
We first consider whether there was sufficient clear and convincing evidence to warrant the termination of appellant's parental rights. The two-step process for considering parental rights cases is noted above. First, as the father "did not appeal the original order of the juvenile court finding that [T.L.H. and O.D.H.] were deprived, he cannot now complain about that finding." (Citation and punctuation omitted.) In the Interest of N.J.W., 233 Ga.App. 130, 133(1)(a), 503 S.E.2d 366 (1998). The unappealed deprivation order establishes that the children are deprived within the meaning of OCGA § 15-11-94(b)(4)(A)(i). See In the Interest of A.W., 240 Ga.App. 259, 262, 523 S.E.2d 88 (1999).
Next, the juvenile court had sufficient evidence to determine that the father's inability to adequately care for the boys was the cause of their deprivation. In determining if the children lack parental care or control, the court shall consider the various factors established by OCGA § 15-11-94(b)(4)(B) and (C), including whether the parent failed, for a period of one year or longer before the filing of the petition for termination of parental rights, to: (1) develop and maintain a parental bond with the child in a meaningful, supportive manner, (2) provide care and support for the child as required by law or judicial decree, or (3) comply with a court-ordered reunification plan. OCGA § 15-11-94(b)(4)(B)(iii) further provides that the court shall consider the "[c]onviction of the parent of a felony and imprisonment therefor which has a demonstrable negative effect on the quality of the parent-child relationship." The record shows that the father had not seen the boys in five years because he was incarcerated after pleading guilty to aggravated assault. Furthermore, the evidence also shows that before his conviction he saw the boys sporadically, every three to four months.
Although "[a] parent's incarceration does not always compel the termination of parental rights, . . . it can support a termination when there are sufficient aggravating circumstances present." (Footnote omitted.) In the Interest of M.C.L., 251 Ga.App. 132, 134(1)(a), 553 S.E.2d 647 (2001). These aggravating circumstances may include, in addition to a history of incarcerations, "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive and parental manner." (Punctuation and footnote omitted.) Stills v. Johnson, 272 Ga. 645, 651(3), 533 S.E.2d 695 (2000).
Here, the father never contacted the children once during his incarceration. Although the father's visitation with his children while incarcerated was eliminated by DFACS, and his only means of communication was through correspondence, he never sent a letter, birthday card, or made a phone call to the boys in five years. Moreover, he never contacted DFACS regarding the boys, despite having contacted the agency to send something to the parole board. Compare In the Interest of J.D.F., 277 Ga.App. 424, 626 S.E.2d 616 (2006) (termination reversed after juvenile court relied solely on the father's current incarceration to support its conclusion that the children's deprivation was likely to continue where there were no aggravating circumstances, and the evidence showed that the father made an effort to bond with children, including writing over 40 letters and attempting to arrange for the children to visit him in prison).
In evaluating the next factor, whether conditions of deprivation are likely to continue, the court may consider the parent's past conduct. Here, there is some evidence of the father's compliance with his case plan, in that he legitimated the boys as directed by the case plan. Arguably, he was in the process of completing the other case plan directive that he "resolve all pending legal issues and commit no further violations of the law." Notwithstanding the father's argument that he complied with his case plan, however, the evidence also showed that despite the legitimation he failed to maintain or establish a meaningful bond with the children for over five years, essentially abandoning *483 them. Additionally, even before his incarceration, he only saw the children sporadically every "three to four months," despite his purported concern that the mother abused drugs. Also, the father testified that he had a "gut feeling" that something was wrong with T.L.H. during the time the child was molested, and upon later learning that the child had been molested did nothing because the mother said "that she would handle it." He also testified that he did not attend the trial of the molester, who was a maternal uncle, because he was in jail at that time on a different charge.
The juvenile court concluded that the conditions of deprivation were likely to continue, and "the trial court, not the appellate court, determines whether a parent's conduct warrants hope of rehabilitation." (Footnote omitted.) In the Interest of A.M.L., 242 Ga.App. 121, 124(1)(c), 527 S.E.2d 614 (2000). Moreover, although the father argues that he substantially complied with his case plan, and the only obstacle in his reunification is his release from prison, "the trial court is not limited to looking solely at subparagraph (b)(4)(C)'s factors." In the Interest of A.M.B., 219 Ga.App. 133, 136, 464 S.E.2d 253 (1995).
The record also supports the trial court's finding, by clear and convincing evidence, that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the boys. OCGA § 15-11-94(b)(4)(A)(iv). There was extensive testimony at the termination hearing about the emotional and psychological frailty of the two boys and the need for permanency in their life. The psychologist who had treated the boys for over two years testified that "each jail term . . . has its consequences for the children."
The same factors showing the existence of appellant's parental misconduct or inability also support the finding that the termination of his parental rights would be in the children's best interests. In the Interest of D.S., 247 Ga.App. 569, 573, 545 S.E.2d 1 (2001). The court, as was the case here, may also consider the child's need for a stable home environment and the detrimental effects of prolonged foster care. In the Interest of J.M.C., 201 Ga.App. 173, 174, 410 S.E.2d 368 (1991). The boys' psychologist testified that T.L.H., in particular, because of the severe sexual abuse he endured, needed "closure and understanding of what's going to happen, where he's going to be." He testified that O.D.H. "needs tremendous consistency." He further testified that the longer the children remain in foster care with the lack of finality that status engenders, the more their progress is impeded. He opined that it was "time to get them stability." The same evidence showing parental misconduct in this case, along with the boys' need for a stable home environment, satisfy the requirement that the termination of the father's parental rights is in the best interests of T.L.H. and O.D.H.
For these reasons, the order of the juvenile court terminating the father's parental rights in T.L.H. and O.D.H. is affirmed.
Judgment affirmed.
MILLER, C.J., and ANDREWS, P.J., concur.