714 S.E.2d 148 (2011)
310 Ga. App. 667
In the Interest of A.E.S., a child.
No. A11A0692.
Court of Appeals of Georgia.
July 7, 2011.
Cynthia Ann Lain, for appellant.
Samuel S. Olens, Atty. Gen., Shalen S. Nelson, Sr. Asst. Atty. Gen., Penny Hannah, Asst. Atty. Gen., for appellee.
MIKELL, Judge.
Following the grant of her application for appeal, Karla Sumlin, mother of *149 A.E.S., appeals from the denial of her motion for new trial following the termination of her parental rights to A.E.S. by the Fulton County Juvenile Court. Finding no error, we affirm.
On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the biological parent's rights to custody have been lost. We do not weigh the evidence or determine the credibility of witnesses, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[1]
So viewed, the evidence shows that, on October 22, 2008, two days following A.E.S.'s birth in prison, the Fulton County Department of Family and Children Services (the "Department") filed a deprivation petition. Following a hearing, A.E.S. was adjudicated deprived by the trial court's order of February 4, 2009. Among the findings of the juvenile court were that Sumlin gave birth while incarcerated; was without a home of her own and unable to provide housing for the child; was unemployed and unable to provide for the financial needs of the child; and that she suffered from mental health problems for which she allegedly failed to take her medication. The order further found that the identity of the putative father was unknown. Sumlin did not appeal this adjudication.
An order on permanency hearing, dated October 16, 2009 and filed November 9, 2009, found that Sumlin had had no contact with A.E.S. while the child was in the Department's custody and had had no contact with the Department. By order dated November 9, 2009, and filed November 16, 2009, the juvenile court extended the Department's custody of A.E.S., finding that the conditions of deprivation continued in that Sumlin had not attended and completed parenting classes, had not obtained stable and safe housing, had not obtained a source of income, and had not submitted to a psychological examination. This order further found that the whereabouts of Sumlin were then unknown. Neither of these orders was appealed.
On October 30, 2009, a Petition for Termination of Parental Rights was filed on behalf of the Department. At the beginning of the hearing on the petition to terminate, held on February 25, 2010, the juvenile court took judicial notice of the previous orders in the case.[2] Caseworker Ruby Crump testified that she had been involved with A.E.S. since April 2009 and that Sumlin's whereabouts were unknown for some period of time because she had been incarcerated under the name of Beyonce Knowles. Sumlin had no contact with either A.E.S. or the Department from the child's birth in October 2008 until the hearing in February 2010. Following the birth of A.E.S., Sumlin was briefly released from prison until she was arrested for assaulting a police officer. At this point, Sumlin gave her name as Beyonce Knowles. She was found incompetent to stand trial and sent to Georgia Regional Hospital in order to stabilize her condition with medication. Sumlin was returned to Fulton County in January 2010 and, according to her, she had been treated for bipolar disorder and schizophrenia. During Crump's meeting with Sumlin in jail on January 11, 2010, she advised Sumlin that a petition for termination of her rights had been filed and Sumlin said she wanted the Department to keep her son until she could get out of jail. According to Crump, A.E.S. has bonded with his foster parents, in whose care he has been for 16 months. Further, according to the caseworker, a child who remains indefinitely in foster care risks suffering from "foster care drift," making the child prone to have issues with behavior, attachment, and bonding. Although present at the hearing on the petition to terminate, Sumlin did not testify.
*150 By order dated May 7, 2010, nunc pro tunc February 25, 2010, and filed on May 10, 2010, Sumlin's parental rights were terminated. Among the 14 factual findings made by the juvenile court regarding Sumlin were that her whereabouts had been unknown from December 2, 2008 until October 2009; she had failed to make any efforts to contact the Department; there had been no contact between parent and child since the child had been placed in the Department's custody; A.E.S. had no attachment or bond with Sumlin; Sumlin had a history of mental illness and a diagnosis of bipolar disorder and schizophrenia; and Sumlin was unable to provide care or a home for A.E.S.
OCGA § 15-11-94 sets out the relevant procedure for considering the termination of parental rights. First, the court must determine whether there is clear and convincing evidence of parental misconduct or inability.[3] If there is, the court must then consider whether termination of parental rights is in the best interest of the child.[4] In determining parental misconduct or inability, the court must find that (1) the child is deprived; (2) the lack of parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue or will not likely be remedied; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child.[5]
Where, as here, Sumlin did not appeal the original order of the juvenile court finding that A.E.S. was deprived, she cannot now complain of that finding.[6] The unappealed deprivation order establishes that A.E.S. is deprived within the meaning of OCGA § 15-11-94(b)(4)(A).[7]
Next, the juvenile court had sufficient evidence to determine that Sumlin's inability to care for A.E.S. was the cause of the child's deprivation. In determining whether a child lacks parental care or control, the court may consider various factors,[8] including whether the parent failed for a period of one year or longer before the filing of the petition for termination to develop and maintain a parental bond with the child in a meaningful and supportive manner, to provide care and support, or to comply with a court ordered reunification plan.
Though "[a] parent's incarceration does not always compel the termination of parental rights, it can support a termination when there are sufficient aggravating circumstances present."[9] One of the aggravating circumstances that may be considered is "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive[,] and parental manner."[10] Here, as repeatedly found by the juvenile court, Sumlin made no effort during the 16 months in which A.E.S. was in foster care to contact him or the Department.
In determining whether the conditions of deprivation are likely to continue, the juvenile court "may place more weight on negative past facts than promises of future conduct."[11]
The record also supports the juvenile court's finding, by clear and convincing evidence, that the continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to A.E.S.[12] The same factors *151 showing the existence of Sumlin's misconduct or inability to care for A.E.S. also support the finding that the termination of her parental rights would be in the best interest of A.E.S.[13] Further, the juvenile court may consider, as it did here, the child's need for a stable home environment and the detrimental effects of prolonged foster care.[14] Here, there was testimony regarding the bonding of A.E.S. with his foster parents, who wish to adopt him, and of the danger of foster care drift if permanency was not established for the child.
We find no error in the ruling of the juvenile court terminating the parental rights of Sumlin to A.E.S. and in denying her motion for new trial.
Judgment affirmed.
SMITH, P.J., concurs. DILLARD, J., concurs specially.
DILLARD, Judge, concurring specially.
While I agree with the majority's conclusion that the juvenile court could have found that present clear and convincing evidence warranted the termination of the natural mother's parental rights, I do not entirely agree with its underlying reasoning and therefore specially concur in the judgment of the Court.
Specifically, I do not agree with the majority's suggestion that a natural parent's rights can be terminated merely because the mother failed to satisfy certain elements of the State's reunification plan (e.g., securing stable employment and housing), or because she was not financially or emotionally capable of parenting her child at the time of the termination hearing.[15] I likewise do not approve of the majority's reliance "on generalized notions of permanency as a basis for terminating parental rights."[16] As I have previously explained,
[w]hile I do not quibble with the general proposition that children need permanency (or, for that matter, the corollary that long-term foster care can have ill effects), I find it troubling that many of our prior decisions upholding the termination of parental rights appear to rely, in part, on such generalizations without specifically tying them to particularized findings of fact, even though we have repeatedly held that a juvenile court is required to make explicit findings of fact that the child at issuerather than some hypothetical child placed in the subject child's situationwill suffer or is likely to suffer serious harm as a result of the continued deprivation.[17]
Nevertheless, I do agree with the majority that the juvenile court was correct in terminating the mother's parental rights because the record evidence shows, clearly and convincingly, that the ongoing parental relationship between the mother and A.E.S. is likely to cause the child serious, actual harm if permitted to continue. As the majority notes, the mother "made no effort during the 16 months in which A.E.S. was in foster care to contact him or the Department."
As our Supreme Court has previously explained, it is one thing if a parent desires to care for his or her child but simply lacks the financial wherewithal or emotional capability to do so, and quite another for a parent to willfully disregard or abandon his or her parental duties.[18] Because I believe that the case sub judice is far closer to falling into the latter category rather than the former, I agree that termination of the mother's parental rights was constitutionally and statutorily permissible.
NOTES
[1] (Footnotes omitted.) In the Interest of F.C., 248 Ga.App. 675, 549 S.E.2d 125 (2001), overruled on other grounds, Miller v. State, 285 Ga. 285, 287, 676 S.E.2d 173 (2009).
[2] In the Interest of J.A., 298 Ga.App. 11, 14(1), 679 S.E.2d 52 (2009) (Juvenile court properly took judicial notice of its prior findings in determining whether the children continued to be deprived.).
[3] OCGA § 15-11-94(a).
[4] Id.
[5] OCGA § 15-11-94(b)(4)(A).
[6] In the Interest of T.L.H., 301 Ga.App. 10, 14, 686 S.E.2d 478 (2009).
[7] Id.; accord In the Interest of J.A., supra.
[8] As set out in OCGA § 15-11-94(b)(4)(B) and (C).
[9] (Footnote omitted.) In the Interest of M.C.L., 251 Ga.App. 132, 134(1)(a), 553 S.E.2d 647 (2001).
[10] (Punctuation and footnote omitted.) Stills v. Johnson, 272 Ga. 645, 651(3), 533 S.E.2d 695 (2000). Accord In the Interest of T.A.M., 280 Ga.App. 494, 497(2), 634 S.E.2d 456 (2006).
[11] (Punctuation and footnote omitted.) In the Interest of A.C., 280 Ga.App. 212, 217(1)(c), 633 S.E.2d 609 (2006).
[12] OCGA § 15-11-94(b)(4)(A)(iv).
[13] In the Interest of D.S., 247 Ga.App. 569, 573, 545 S.E.2d 1 (2001).
[14] In the Interest of T.L.H., supra at 14, 686 S.E.2d 478.
[15] See In the Interest of M.M.S., 308 Ga.App. 614, 626, 708 S.E.2d 570 (2011) (Dillard, J., concurring specially).
[16] In the Interest of J.E., 309 Ga.App. 51, 66, 711 S.E.2d 5 (2011) (Dillard, J., dissenting).
[17] Id.
[18] See Thorne v. Padgett, 259 Ga. 650, 651, 386 S.E.2d 155 (1989).